**Frank REISNER, d/b/a Intermeccanica Automobili and Indra Imports, Inc., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION and Adam Opel, A.G., Defendants.**

No. 76 Civ. 2241 (GLG).

United States District Court, S. D. New York.

March 30, 1981.

---

Howard F. Cerny and Nick C. Spanos, New York City, for plaintiffs by Nick C. Spanos, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants by Irving Scher, Robert A. Weiner, R. Peyton Gibson, Jay N. Fastow, Martin S. Hyman, New York City, of counsel and Otis M. Smith, Detroit, Mich., General Motors Corp. by William B. Slowey, Detroit, Mich., of counsel.

## OPINION

GOETTEL, District Judge:

The plaintiffs in this antitrust action are Frank Reisner, a Canadian citizen now living in California, who owned and operated a small automobile manufacturing company in Italy, and Indra Imports, Inc., a New Jersey corporation, which was Reisner's importer and distributor in the United States. The defendants are General Motors Corporation, the giant manufacturer of automobiles and other products, and Adam Opel, A.G., a wholly owned General Motors subsidiary, which is incorporated in Germany.

*Factual Background*

In 1970, Reisner's company, Intermeccanica Automobili, in Turin, Italy, was manufacturing a sports car called the Italia, which was powered by a Ford engine. In the early fall of that year, Frank Reisner met with Robert Lutz, the General Sales Manager of Opel, and discussed Reisner's manufacturing a new car using General Motors engines and certain components [1] used in the Opel Diplomat. Reisner then designed and began to manufacture his new car, the Indra, using the Opel drive train components and a Chevrolet 327 engine, which was the General Motors engine used in the Opel Diplomat. The first Indra was shown at the International Auto Show in Geneva, Switzerland, in the spring of 1971.

For the next two years, Reisner manufactured Indras, with Opel components and Chevrolet 327 engines purchased from Opel through a German company (Bitter GmbH & Co. KG) established by Erich Bitter, who was Reisner's distributor and representative in West Germany, Switzerland, and the Benelux countries. Reisner attempted to sell his cars in Germany through Opel distributors, apparently without marked success.[2]

In May 1972, Reisner contacted General Motors Italia SpA, an Italian subsidiary of General Motors, seeking to purchase the Chevrolet 350 engine for the Indra so that he could sell his car in the United States.[3] The Chevrolet 350 not only was more powerful than the Chevrolet 327, but also, unlike the Chevrolet 327, was equipped with pollution control devices that would qualify it for sale in the United States. Reisner had mentioned that his annual production was about one hundred and fifty cars and expressed an interest in purchasing engines in lots of twenty. After he was advised in July 1972 that General Motors would not sell the engines in the low volume he was proposing,[4] Reisner and Joseph Vos, who became the president of Indra Imports, Inc. when it was incorporated in May 1973, made further attempts to purchase Chevrolet 350 engines from General Motors. General Motors never agreed to sell the engines to Reisner.

---

1. The Opel components included front and rear suspension parts and axles, the braking system, and the steering wheel and column.

2. Approximately one hundred Indras were manufactured during those years, including about thirty-three in 1971 and forty-five in 1972, although initially approximately two hundred had been planned for 1971 alone. Many orders for the Indra (about one hundred and seventy) were received from the Opel dealers who saw the prototype Indra at the Geneva auto show. Orders apparently fell off after defects were discovered in the Indras delivered to the dealers. The plaintiffs and the defendants disagree as to the seriousness and pervasiveness of the defects.

3. Reisner apparently became actively interested in the United States market for the Indra at that time because of the introduction in Congress in the spring of 1972 of the "Checker Amendment" to the National Traffic and Motor

Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381 *et seq.* The amendment, which was enacted in October 1972, provided for an economic hardship exemption from the requirements of the Act for manufacturers of fewer than ten thousand automobiles per year.

4. General Motors had a policy of requiring a minimum order of two hundred for Chevrolet engines, although smaller orders were still filled for a few manufacturers under arrangements that predated the institution of the policy.

   Reisner's purchase of the Chevrolet 327 engines had not been affected by the policy apparently because he purchased the engines from Opel, not from General Motors. Opel did not use the Chevrolet 350 engines and would not have been in a position to sell them to Reisner.

Unable to buy the Chevrolet 350, Reisner prepared to use the Ford 351 engine, which was equipped with pollution control devices adequate for the United States market, in the Indra. Thereafter, in February 1973, Opel informed Reisner that it would not sell him Opel components for use with the Ford 351 engine. Vos then renewed his attempts to persuade General Motors to sell Reisner the Chevrolet 350 in the numbers he required (less than the announced minimum of two hundred engines per year). He was unsuccessful.

Reisner claims that as a result of these events he had to abandon his automobile manufacturing business in Italy. Both plaintiffs claim substantial losses in investment and profits.

*Procedural Background*

The plaintiffs filed their original complaint on May 19, 1976, alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. By stipulation with the defendants, the plaintiffs filed an amended complaint on July 11, 1977, expanding their factual allegations and adding a claim under section 3 of the Clayton Act, 15 U.S.C. § 14. As amended, the complaint alleges essentially a tying violation under section 1 of the Sherman Act and section 3 of the Clayton Act. Although the complaint alleges a monopolization violation under section 2 of the Sherman Act, the plaintiffs have not pursued that claim and appear to have dropped it.[5]

The defendants moved to dismiss in August 1977, and the motion was denied on November 7, 1977. Over the next two years, extensive discovery was taken. On December 18, 1979, after discovery had been completed and while motions for summary judgment were being prepared, the plaintiffs moved for leave to file a second amended complaint, which the defendants (understandably) opposed. On February 14, 1980, the defendants filed their motion for summary judgment,[6] which was argued on

March 14, 1980. For months thereafter, the parties, principally the plaintiffs, continued to file additional voluminous, unauthorized papers.

*Second Amended Complaint*

The plaintiffs assert that their proposed second amended complaint is needed for three reasons:

(i) to eliminate vexatious issues under Section 2 of the Sherman Act (15 U.S.C. Section 2), which are raised therein and which have taken up the time of the Court and the parties, out of all proportion to their importance in this case; (ii) to guard against misunderstanding and misinterpretation of the conspiracy allegations in the Amended Complaint, which the existing record shows is a possible risk; and (iii) to amplify and update the allegations of the Amended Complaint by reference and incorporation therein of matters previously unknown to Plaintiffs, which became known only during the recent discovery which the Court allowed Plaintiffs to conduct.

(Notice of Motion at 1.) They also assert that the "proposed pleading does not raise new issues"; "will not operate ... to the prejudice of any party"; and will "further the interests of justice, hasten the setting of a trial date, and expedite disposition of this case." (*Id.* at 2.) The defendants vigorously oppose the granting of leave to file a second amended complaint, arguing that the motion is untimely, made in bad faith, designed to forestall the granting of summary judgment, prejudicial to the defendants, and clearly dilatory.

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a pleading should "be freely given when justice so requires." Granting or denying such leave, however, is within the discretion of the court, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), which has an obligation

---

**5.** *See* discussion of the proposed second amended complaint *infra*.

**6.** Although the plaintiffs at least partially prepared their own motion for summary judgment, they never filed it with the court.

to determine whether allowing the amended pleading will cause substantial prejudice to the other parties or substantial inconvenience. 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1484 (1971).

Despite the plaintiffs' assertions that the proposed second amended complaint raises no new issues, it does seem to add a new theory of recovery—that of group boycott [7] —in Count Three, which includes paragraphs 36–51. Moreover, it adds many new factual allegations, several of which seem to be inconsistent with allegations in the earlier two complaints [8] or seem to be facts that should have been within the plaintiffs' knowledge at the time the earlier complaints were drafted.[9]

■ No justification for the delay in presenting these new factual allegations and this new theory of recovery is given in the plaintiffs' memorandum in support of their motion. None is given in their moving papers, except those already quoted, which, as is noted above, are inapplicable to most of the new factual allegations. In this context, the view of the proposed pleading as an attempt to forestall a ruling against the plaintiffs on a motion for summary judgment is not incredible.[10] Such a motivation for a new complaint would clearly justify denial of permission to file it. *Kirby v. P. R. Mallory & Co., Inc.*, 489 F.2d 904, 912–13 (7th Cir. 1973), *cert. denied*, 417 U.S.

911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974); *Roorda v. American Oil Co.*, 446 F.Supp. 939, 947–48 (W.D.N.Y.1978); *Billy Baxter, Inc. v. Coca-Cola Co.*, 47 F.R.D. 345, 350 (S.D.N.Y.1969), *aff'd*, 431 F.2d 183 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

■ More important, it appears that granting the plaintiffs leave to amend their complaint after discovery has been completed on the basis of the first amended complaint—and a motion for summary judgment has been prepared on the basis of that discovery—would be both prejudicial to the defendants and wasteful of the time of the Court and the attorneys. Such a situation, also, is adequate justification for denying leave to amend. *Doe v. McMillan*, 566 F.2d 713, 720 (D.C.Cir.1977), *cert. denied*, 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 59 (1978); *Rogers v. Valentine,* 426 F.2d 1361, 1363 (2d Cir. 1970); *Roorda v. American Oil Co., supra.* To the extent that the proposed second amended complaint adds new or inconsistent factual allegations, new discovery would be needed to allow the defendants to respond to the new facts and the new legal theory. That would delay considerably [11] the disposition of this case, which is already nearly five years old, the next to oldest case on this Court's docket,

7. *See* discussion *infra.*

8. For example, the proposed second amended complaint states: "At all relevant times, plaintiffs REISNER and VOS were engaged in a joint venture for the sale of the *INDRA* in the United States, and may be referred to herein as "REISNER/VOS." Not only do the earlier complaints fail to mention this "joint venture," but they describe the relationship between Reisner and Vos in terms inconsistent with the existence of a joint venture. At any rate, the *existence of a joint venture between Reisner and Vos was certainly within the knowledge of the plaintiffs when the original complaints were drafted.

9. For example, the terms of an alleged oral agreement between Reisner and Opel on September 4, 1970, are spelled out in great detail. Surely Reisner knew all this even better in 1976 and 1977 than at the end of 1979. This could not have been information that "became

known only during the recent discovery which the Court allowed Plaintiffs to conduct."

10. The shifting of legal theories and adding of inconsistent allegations raise a substantial doubt as to the good faith of the plaintiffs' counsel in asserting them. The Federal Rules of Civil Procedure admonish an attorney not to sign a pleading unless "to the best of his knowledge, information, and belief there is good ground to support it" and "it is not interposed for delay." Fed.R.Civ.P. 11.

11. The history of this particular litigation makes this Court especially apprehensive about the delay that additional discovery would cause. Discovery in this action has been protracted and acrimonious, and enormous amounts of paper have already been generated, some of it literally just paper—*e. g.*, massive photocopies of massive documents already submitted.

and a "judicial emergency." [12] It would be pointless for the Court to allow the plaintiffs to pursue yet another antitrust theory—in accordance with new facts—in what appears to be essentially a contract dispute,[13] and it would be prejudicial to the defendants to require them to expend the additional time and money needed to defend themselves against the proposed second amended complaint at this late date.

An additional reason for denying leave to amend is that a brief look at the proposed boycott claim demonstrates further the futility of allowing this action to continue. The plaintiffs allege that Opel and General Motors conspired "to prevent the importation and sale of the *Indra* in the United States." Allegedly as part of the conspiracy, Opel and General Motors "refused to sell to plaintiffs Chevrolet 350 CID pollution-free engines" and "refused to sell Opel components to plaintiffs if plaintiffs attempted to use in the *Indra* an engine manufactured or sold by a supplier other than GM or Opel."

■ A parent corporation and a subsidiary may in some circumstances be considered independent conspirators under section 1 of the Sherman Act, *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). Although this Court makes no determination at this time as to whether the defendants could be shown to be independent conspirators, for several reasons, this seems to be a particularly inappropriate case in which to find such an intra-enterprise conspiracy.

First, the cases in which an intra-enterprise conspiracy has been found have generally been price-fixing cases. *See, e. g., Timken Roller Bearing Co. v. United States, supra; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, supra.* No case has been cited in which a conspiracy to boycott on the part of a parent and its wholly owned

subsidiary has been found; indeed, the Second Circuit has explicitly left open the question of whether a group boycott conspiracy could be found in such a situation. *See International Railways of Central America v. United Brands Co.*, 532 F.2d 231, 240 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976). *See also Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358–59 n.1 (2d Cir. 1976) (expressing skepticism toward the doctrine of intra-enterprise conspiracy).

■ Second, the conduct alleged here is essentially consultation between General Motors and Opel concerning company-wide General Motors policies for the sale of General Motors engines to other manufacturers. A parent corporation and its subsidiary surely must be able to consult on some matters of company policy without violating the antitrust laws—absent a demonstration of anticompetitive motivation. *See Joseph E. Seagram and Sons v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). The consultations involved here are well within the range of normal business activities between a parent and a subsidiary. And no evidence of an anti-competitive objective has been presented.

Finally, the allegation that there was a group boycott conspiracy between General Motors and Opel to prevent the importation and sale of the Indra in the United States seems rather bizarre, since the Indra was *created* only after Opel had agreed to supply Opel components and Chevrolet 327 engines to Reisner. If Opel and General Motors were concerned with preventing the Indra from being sold in the United States, why did Opel make its creation possible? *Cf. Speed Auto Sales, Inc. v. American Motors Corp.*, 477 F.Supp. 1193, 1196 (E.D.N.Y. 1979) ("no logical basis" for anticompetitive conspiracy since the supposed beneficiary of the conspiracy could have accomplished the objective alone); *Diehl & Sons v. Interna-*

---

**12.** A case constitutes a judicial emergency when it becomes three years old.

**13.** *See* note 25 *infra* and accompanying text.

*tional Harvester Co.*, 426 F.Supp. 110, 117 (S.D.N.Y.1976) (same).

Accordingly, the plaintiffs' motion for leave to file a second amended complaint is denied.

*Summary Judgment Standard*

■ The general rule that summary judgment should be used sparingly in antitrust cases, *see Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), does not mean that summary judgment should never be used in such cases. Awarding of summary judgment in antitrust cases in which there was "no genuine issue as to any material fact," Fed.R.Civ.P. 56(c), has found approval in the Supreme Court, *see, e. g., First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), and in this circuit. *See, e. g., Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc.*, 614 F.2d 832 (2d Cir. 1980); *Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102 (2d Cir. 1975). The Supreme Court has stated:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*First National Bank of Arizona v. Cities Service Co., supra*, 391 U.S. at 290, 88 S.Ct. at 1593. Summary judgment is particularly appropriate where, as in the instant case, there has already been extensive discovery. *See First National Bank of Arizona v. Cities Service Co., supra; Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., Inc., supra.*

Of course, in order to prevail on their motion for summary judgment, the defendants, as the moving party, must show that there is "no genuine issue as to any materi-

al fact" and that they are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, in making its decision, the Court must view the facts "in the light most favorable" to the party opposing the motion—in this case, the plaintiffs, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *FLLI Moretti Cereali S.p.A. v. Continental Grain Co.*, 563 F.2d 563 (2d Cir. 1977), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975). The party opposing the motion, however, "may not rest upon the mere allegations or denials of his pleading," but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e).

*Factual Issues*

■ The defendants have attempted to meet their burden of showing the absence of genuine issues as to any material fact by submitting the required statement pursuant to Rule 3(g) of the Civil Rules for the United States District Court for the Southern District of New York.[14] The plaintiffs, however, have filed no "statement of the material facts as to which it is contended that there exists a genuine issue to be tried," as Rule 3(g) requires of a party opposing a motion for summary judgment. Technically, the result of the plaintiffs' omission is that the facts alleged by the defendants are deemed to be admitted. *Katz v. Realty Equities Corp.*, 406 F.Supp. 802, 804 (S.D.N.Y.1976). Indeed, the Second Circuit has affirmed the granting of summary judgment in such a situation. *See Securities and Exchange Commission v. Research Automation Corp.*, 585 F.2d 31, 34 (2d Cir. 1978).

Instead of filing the type of Rule 3(g) statement required of a party opposing summary judgment, the plaintiffs have filed a Rule 3(g) statement of material facts as to which they allege there is *no* genuine issue to be tried—but without an accompa-

---

**14.** Rule 3(g) was formerly (before October 31, 1980) Rule 9(g) of the General Rules of the United States District Courts for the Southern and Eastern Districts of New York.

nying motion for summary judgment. However inappropriate it may be, the plaintiffs' Rule 3(g) statement does differ somewhat from the Rule 3(g) statement of the defendants. In addition, the plaintiffs' affidavits either explicitly or implicitly refer to several issues of fact. Consequently, the Court will overlook the plaintiffs' technical deficiency.[15]

■ Factual disputes that are not material to the determination of the case, however, will not prevent the granting of summary judgment. Fed.R.Civ.P. 56; *Securities and Exchange Commission v. Research Automation Corp., supra*, 585 F.2d at 35. Thus, the remaining question is whether the issues here are issues of material fact.

The plaintiffs explicitly denominate two issues of fact: (1) "whether or not defendants' disparagement of Reisner and of the car Reisner produced was justified or true" (Affidavit of Nick C. Spanos at 14); and (2) whether there were "conditioned sales" from the defendants to Reisner (*id.* at 101 *passim*). In addition, several other issues of fact, although they are not denominated as such, are clearly implied from the differing statements of the facts by the plaintiffs and the defendants. Among these issues are: whether Opel or Reisner initiated the idea of designing a new car using the components and engines used in the Opel Diplomat; whether General Motors had a policy of not selling Chevrolet 350 engines in amounts smaller than two hundred; whether General Motors had a policy of testing for pollution control non-General Motors cars with General Motors engines; whether Opel promised Reisner it would sell him Chevrolet 350 engines; whether the Chevrolet 350 engine would be unsafe or infeasible in the Indra; whether Opel competed with General Motors; and when the first discussions of Reisner's using Chevrolet 350 engines in his cars took place.

■ Of all the issues of fact explicitly or impliedly raised by the plaintiffs' papers, none is material to the plaintiffs' claim of a tying violation except the issue of whether there were conditioned sales.[16] Conditioned sales, which are a necessary element of a tying violation, are sales by a defendant of the tying product (here, Opel drive train components) on the condition that the purchasers also buy the tied product (here, Chevrolet 327 engines), or at least agree not to buy a competitor's version of the tied product.[17] There was no dispute on this issue until plaintiff Reisner submitted an affidavit dated February 29, 1980, two weeks before the summary judgment argument. Reisner's deposition, taken in the spring of 1979, as well as the other depositions and documents submitted by both sides on this motion for summary judgment, offer no support for the proposition that Reisner was required to buy unwanted Chevrolet 327 engines in order to get the Opel components he wanted. But Reisner states in his affidavit of February 29, 1980, that the 327 engine was "forced down our throats" and that he "never wanted" it (Affidavit of Frank Reisner, Feb. 29, 1980, at 2). Although he admits that he stated in his deposition that he "wanted every 327 engine [he] could get" (*id.* at 3), he says he didn't mean it (*id.*).[18] A plaintiff surely cannot be permitted to defeat a motion for

---

15. Ironically, the plaintiffs, in papers filed on April 1, 1980, moved to strike certain paragraphs of the defendants' Rule 3(g) statement, on grounds of noncompliance with the rule. The plaintiffs also moved to strike the affidavits of Alexander C. Cunningham and William B. Slowey and the defendants' document entitled "Plaintiffs' Record Admissions ...," all of which were submitted in support of the defendants' motion for summary judgment, on grounds of, *inter alia*, noncompliance with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure. Since the Court is overlooking the technical deficiencies in the plaintiffs' papers, it will do likewise with the alleged deficiencies in the defendants' papers.

16. Under either the Sherman Act or the Clayton Act, there are at least two essential elements of a tying violation, conditioned sales and a resulting anticompetitive effect on a not insubstantial amount of commerce in the tied product market. *See* tying discussion *infra*. All of the other factual disputes mentioned are immaterial to both of those elements.

17. *See* discussion *infra*.

18. Reisner also submitted on March 6, 1980, on the eve of the summary judgment hearing, hundreds of pages of "corrections" to his deposition taken from March to July of 1979. Some of these corrections were of typographical or

summary judgment, thus compelling a defendant to defend himself in an antitrust trial, simply by contradicting his earlier version of the facts, thereby creating an internal inconsistency in the plaintiff's story.

### The Tying Claims

In order to prevail on their motion for summary judgment, besides showing that there are no issues of material fact, the defendants must also show that they are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Since the plaintiffs have adduced no evidence to support their monopolization claim and indeed have stated that it was inevitable that the claim would be dropped (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Leave to File a Second Amended Complaint at 1), the legal theory against which the plaintiffs' allegations must be tested is that of tying.

■ Tying is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The first product—in the instant case, allegedly, the Opel components—is the tying product. The second—here, allegedly, the Chevrolet 327 engines—is the tied product. The evil in tying is that the seller's leverage in the tying product market enables it to "deny competitors free access to the market for the tied product." *Id.* at 6, 78 S.Ct. at 518.

■ Tying is a *per se* violation of both section 1 of the Sherman Act and section 3 of the Clayton Act.[19] The ele-

ments of the violation under the two statutes are very similar. Section 3 of the Clayton Act states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. Thus, the elements of a violation of section 3 are: (1) sales of goods for use, consumption, or resale within the United States; (2) sales conditioned on the purchaser's not dealing in the goods of a competitor; (3) a potential effect of substantial lessening of competition in the market for the tied product. Section 1 of the Sherman Act is much more general, stating simply: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Thus, the specific requirements of a

---

spelling errors. Others, however, were substantive, such as changing "Yes" to "No" or adding new paragraphs to the deposition testimony. The defendants have submitted affidavits from the stenographers who recorded the deposition testimony, stating that their transcripts as originally submitted were correct, except for minor typographical or spelling errors.

**19.** Tying can also constitute a "rule of reason" violation. The plaintiffs seem to have dropped

this claim, however, since they have not attempted to define the relevant markets and, during the discovery period, have adduced no evidence regarding the foreclosure of those markets, as is required under the rule of reason. *See, e. g., Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 615, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). Nor have they presented evidence of unlawful intent on the part of the defendants, as is also required. *See id.* at 614–15, 73 S.Ct. at 883.

tying violation under that statute must be found in the case law. A recent Second Circuit case lists five elements: (1) a tying product and a tied product; (2) "evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product"; (3) the seller's possession of "sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product"; (4) "anticompetitive effects in the tied [product] market"; (5) "involvement of a 'not insubstantial' amount of interstate commerce in the tied product market." *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56–57 (2d Cir. 1980).

█ Two differences between the statutes are that under the Clayton Act both products must be goods, whereas under the Sherman Act they could also be services, and that the Clayton Act includes a requirement that the goods be for use, consumption, or resale within the United States. The first of these Clayton Act requirements need not detain us because clearly the products involved here are goods. The second requirement, however, bears mentioning. Since the relevant sales in the instant case were sales in Europe of Opel components and Chevrolet 327 engines for Indras to be sold in Europe for use in Europe (except possibly the two sets of components Reisner ordered in July 1973, *see* note 24 *infra*), they would not satisfy the Clayton Act requirement of use, consumption, or resale within the United States. Another difference between the two statutes is that Sherman Act tying requires that the seller have economic power in the tying product market, whereas the Clayton Act omits this requirement.[20] Otherwise, proof of tying under one statute essentially satisfies the requirements of the other.

Basic to a tying violation under either statute is the requirement of conditioned sales. In the Clayton Act, this requirement is expressed in those words: "sale . . . of goods . . . on the condition . . . that the . . . purchaser . . . not use . . . the goods . . . of a competitor . . . of the . . . seller." Under the Sherman Act, the requirement is expressed in terms of the seller coercing the buyer of the tying product into buying the tied product also. The situation at which both statutes aim, however, is the same—a seller using a wanted product to force sales of an unwanted product, either directly, by requiring buyers to buy the second product to get the first, or indirectly, by forbidding buyers of the wanted product to buy a competitor's version of the unwanted product. The Second Circuit has stated that "no tying arrangement can possibly exist unless the person aggrieved can establish that he has been required to purchase something which he does not want to take." *Capital Temporaries, Inc. of Hartford v. Olsten Corp.*, 506 F.2d 658, 662 (2d Cir. 1974).[21]

█ Such a situation does not exist here. The plaintiffs assert that they were required to purchase unwanted Chevrolet 327 engines in order to get wanted Opel components, or that they were denied the right to buy the Opel components for use with the Ford 351 engines.[22] There is no

---

20. *See* discussion *infra*.

21. The "unremitting policy of tie-in," which under some circumstances can substitute for coercion, *see Hill v. A–T–O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), is appropriate only in a situation such as that in *Hill*, where the policy was applied to all buyers. Here, there is no evidence that the defendants required all purchasers of Opel components to buy Chevrolet 327 engines or not to buy engines from the defendants' competitors. Indeed, there is no evidence of who, if anyone, besides Reisner bought Opel components from the defendants. The plaintiffs seem to suggest that the defendants' consistent refusal to sell Reisner Opel components for use with a Ford engine makes an unremitting policy to tie. Such conduct cannot constitute an unremitting policy to tie in

violation of the antitrust laws, which are designed to promote competition in the marketplace as a whole, not to protect an individual buyer. *See, e. g., Levin v. National Basketball Association*, 385 F.Supp. 149, 152 (S.D.N.Y. 1974).

22. The idea that the defendants were coercing Reisner into buying unwanted products seems strange indeed here, since the history of Reisner's deteriorating relationship with the defendants suggests very strongly that during 1972 and 1973 the defendants were trying to get out of selling Reisner anything. Coercion is an essential element of tying because the theory of the violation is that tying arrangements "foreclose a substantial quantity of business to competition and extend pre-existing economic power to new markets for no good justification."

evidence,[23] however, that the Chevrolet 327 engines Reisner purchased were unwanted. To the contrary, there is considerable evidence that Reisner avidly pursued the purchase of the Chevrolet 327 engines for use in the Indras he was manufacturing for the European market.[24]

The other essential element of tying under both statutes is that of an anticompetitive effect on a not insubstantial amount of commerce in the market for the tied product. This element is also lacking in the instant case. The understanding that Reisner arrived at with Opel in September 1970 for the purchase of Opel components and Chevrolet 327 engines appears to have been a special arrangement. Only one buyer—Reisner—was affected by it. Reisner made relatively few purchases in total—approximately one hundred sets of engines and components over a three-year period—and only two of those were conceivably tied. *See* note 24 *supra*. This does not appear to be the sort of conduct the antitrust laws were meant to prohibit.

The cases speak of the effect on an "appreciable number of buyers" in the tied product market. *See, e. g., Fortner Enterprises, Inc. v. United States Steel Corp. (Fortner I)*, 394 U.S. 495, 504, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969). The plaintiffs cite no tying case in which only one contract between one buyer and one seller constituted a violation of the antitrust laws.[25] *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), which the plaintiffs do *not* cite, did involve a single contract, but that was a twenty-year requirements contract worth $128,000,000. And the Supreme Court found that it did *not* tend to foreclose a substantial volume of competition and thus found no tying.

The evidence of suppression of competition presented by the plaintiffs in this case consists of data about the numbers of Opel and General Motors automobiles manufactured and sold during certain years. (*See* Plaintiffs' Statement of Material Facts ¶ 29.) Although the plaintiffs recite these figures after the introductory statement that the "volume of interstate commerce effected [*sic*] by the wrongful acts of the defendants is not insubstantial," the Court does not see how the defendants' behavior toward Reisner affected this com-

---

American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). Rather than trying to extend into new markets, the defendants seemed to be running from this market—at least insofar as Reisner was involved.

23. The only exception is Reisner's affidavit of February 29, 1980, which has already been discussed and which contradicts all other evidence submitted, including Reisner's depositions.

24. There is some support for Reisner's claim that he made clear to the defendants through his relationship with them that he wanted Chevrolet 350 engines eventually for Indras that could be sold in the United States. But the relevant question for tying is not whether Reisner wanted the 350 engines, but whether he did *not* want the 327's.

The only possible unwanted 327 engines were the two that Reisner himself bought when he ordered components directly from Opel on June 20, 1973, after his relationship with Erich Bitter had ended. These purchases were the only ones made after Reisner had been informed

that he would not be sold Opel parts for use with the Ford 351 engines. The earlier sales to Reisner could not have been conditioned or coerced by the defendants' refusal to sell Opel components without the 327 engines, because they were made at a time when Reisner did not know that the defendants would not sell the Opel components without the Chevrolet 327 engines. If these last two sales were conditioned sales, they were certainly *de minimis*.

25. Numerous cases are filed in the federal district courts attempting to make antitrust claims out of what are, at most, contract claims or fraud claims involving conduct between two parties. Such cases are troublesome because of the inherent difficulty of trying to prove a negative and because of the exceedingly broad and general language of the antitrust laws, particularly the Sherman Act. Such claims are regularly dismissed, however, after taking up considerable amounts of judicial time. *See, e. g., Bucher v. Shumway*, 452 F.Supp. 1288, 1291–93 (S.D.N.Y.1978) (fixing the price of a particular securities purchase was not cognizable under the antitrust laws); *Madison Fund, Inc. v. Charter Co.*, 406 F.Supp. 749, 751 (S.D.

merce.[26] More important, this is not the relevant market for a tying violation. The market where suppression of competition must be found in order to support the plaintiffs' claim in the instant case is the market for engines, not the market for automobiles. Since no evidence has been presented concerning the size of the market for engines, it is difficult to determine the percentage foreclosed; but no engines—or, at most, two, see note 24 supra—certainly cannot represent a substantial percentage. Moreover, there is no evidence that the market for engines was a market the defendants were trying to foreclose or that any competitors were being foreclosed. See Coniglio v. Highwood Services, Inc., 495 F.2d 1286, 1292–93 (2d Cir.), cert. denied, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). It is common knowledge that the defendants compete with Ford, the Japanese producers, and other automobile companies in the sale of automobiles, not in the sale of engines.

■ For tying under the Sherman Act, but not under the Clayton Act, the seller's economic power in the tying product market must also be shown. This element, too, is lacking in the instant case. The plaintiffs allege that the defendants were the only source of the tying product, the Opel components; thus, it is claimed, the defendants obviously had sufficient economic power to coerce the purchase of the tied product, the Chevrolet 327 engines. But the tying product market cannot consist of Opel components; it must consist of automobile components, unless, of course, the Opel components were unique. The only thing that made the Opel components unique in the instant case is that Reisner designed his car around them. (His earlier car, the Italia, had not used Opel parts, so it was obviously feasible to build a sports car without them.) Some special advantage inherent in the product, however, not the plaintiff's own action or choice, is required to make a product unique.[27] The Supreme Court has recently narrowed the concept of the uniqueness that is needed to create sufficient economic power in the tying product market. See United States Steel Corp. v. Fortner Enterprises, Inc. (Fortner II), 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), in which the Court discussed uniqueness in restrictive terms and found unusually favorable credit terms insufficiently unique.

Since the essential elements of tying under either the Sherman Act or the Clayton Act appear to be absent in this case, summary judgment should be granted in favor of the defendants.

*Summary*

The plaintiffs' motion for leave to file a second amended complaint is denied.[28] The plaintiffs' motion to strike is also denied.[29] For the reasons stated herein, the defendants' motion for summary judgment is granted. Since summary judgment is granted in favor of the defendants, the defendants' motion to preclude[30] and the

---

N.Y.1975) (antitrust laws "not designed to police the performance of private contracts").

**26.** As has already been emphasized, the "not insubstantial" effect must be in the market for the tied product—that is, automobile engines.

   Among the figures cited by the plaintiffs is that of "26,299,255 cars domestically manufactured by GM" in the period 1971–1976. The plaintiffs assert that these cars "were affected by the aforesaid restrictive GM sales policy which prevented a purchaser of a GM car to have a non GM engine of purchaser's choice installed in said car at the time of purchase." As has already been noted, the finished automobile market is not the relevant market for establishing tying of engines to certain components. Furthermore, the Court finds the fact that General Motors cars are sold with General Motors engines neither surprising nor an antitrust violation. "[I]t does not constitute a ty-

ing arrangement for an auto dealer to require purchasers of cars to also buy the engines from him . . . ." Beefy Trail, Inc. v. Beefy King International, Inc., 348 F.Supp. 799, 806 (M.D.Fla. 1972).

**27.** The focus of the inquiry is on the seller rather than on the individual buyer. Hill v. A–T–O, Inc., 80 F.R.D. 68, 69 (E.D.N.Y.1978). To the extent that the instant opinion is inconsistent with this Court's earlier opinion on the motion to dismiss, the earlier opinion was erroneous.

**28.** See discussion supra.

**29.** See note 15 supra.

**30.** The defendants moved in December 1979 to preclude the plaintiffs from introducing evi-

defendants' motion for an order permitting the filing and use of unsigned deposition transcripts [31] are rendered moot.

So ordered.

dence not already in the record regarding the monopolization claims. Since the plaintiffs have withdrawn those claims and the Court has deemed them withdrawn, and since the Court has decided that the case should not proceed to trial, no purpose is served by deciding the motion.

**31.** This motion was made in March 1980 to permit the filing of unsigned deposition transcripts of Frank and Paula Reisner and to strike the changes made in the depositions. *See* note 18 *supra*. Since the Court has decided that the case should not proceed to trial, there is no need to decide this motion.