**Frank REISNER, d/b/a Intermeccanica Automobili, and Indra Imports, Inc., Plaintiffs-Appellants,**

v.

**GENERAL MOTORS CORPORATION and Adam Opel, A.G., Defendants-Appellees.**

No. 437, Docket No. 81–7332.

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1981.

Decided Feb. 8, 1982.

Michael Lesch, New York City (Shea & Gould, Steven E. Levitsky, New York City, of counsel), for plaintiffs-appellants.

Irving Scher, New York City (Weil, Gotshal & Manges, R. Peyton Gibson, Jay N. Fastow, Martin S. Hyman, New York City, of counsel; and Otis M. Smith, William B. Slowey, of General Motors Corp., Detroit, Mich., of counsel), for defendants-appellees.

Before MOORE, TIMBERS and VAN GRAAFEILAND, Circuit Judges.

LEONARD P. MOORE, Circuit Judge:

For three years in the early 1970's, Adam Opel, A.G. ("Opel"), the wholly-owned German subsidiary of General Motors Corporation ("GM"), sold components and engines to Frank Reisner, the owner of a small specialty automobile manufacturing company in Italy, Intermeccanica Automobili, for use in manufacturing a high performance sports car called the Indra. Following Opel's termination of the relationship in 1973, Reisner and his American importer, Indra Imports, Inc., brought this antitrust action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, claiming that Opel had tied sales of Opel components to sales of engines and had conspired with GM to prevent Reisner from exporting the Indra to the United States. After five years of discovery, the District Court for the Southern District of New York (Goettel, J.), entered summary judgment for the defendants GM and Opel on March 30, 1981, and dismissed the complaint. *Reisner v. General Motors Corp.*, 511 F.Supp. 1167

(S.D.N.Y.1981). The district court viewed Reisner's amended complaint as asserting essentially a tying claim, and it found that Reisner had failed to establish the essential elements of that claim. Plaintiffs do not appeal from the dismissal of their tying claims under Section 3 of the Clayton Act, but argue that the district court improperly dismissed their claims under Section 1 and 2 of the Sherman Act. Specifically, Reisner argues that GM, Opel, and Reisner's European distributor, Bitter GmbH & Co., engaged in a group boycott to prevent the importation and sale of the Indra in the United States. The district court found meritless the boycott conspiracy allegation, and denied Reisner's motion to file a second amended complaint setting forth such an allegation. Finally, the district court found that plaintiffs had "withdrawn" their monopolization claims, and so it held moot defendants' motion to preclude evidence not already in the record regarding these claims. For reasons set forth below, we affirm.

## I.

On this motion for summary judgment, we have drawn the facts of the case from the discovery record and the affidavits submitted by the parties. Where the evidence is susceptible of different inferences, we have taken the reasonable inference most favorable to the plaintiffs, against whom summary judgment was granted. However, we have disregarded those factual claims made by Reisner after GM moved for summary judgment, where those claims contradict statements made previously by Reisner at his deposition, in his affidavits, and in response to defendants' interrogatories. See *Schwimmer v. Sony Corp. of America*, 637 F.2d 41, 45–46 (2d Cir. 1980); *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).

In 1970, Reisner's company, Intermeccanica Automobili, was manufacturing a sports car with a Ford engine called the Italia. Reisner produced approximately 100 Italias per year, most of which he exported to the United States. The bulk of the remainder he sold in Europe through his German distributor, Erich Bitter. Although Reisner sold a total of over 300 Italias in the United States, his American distributors eventually became disenchanted with the car. In this setting, Reisner began negotiations with Opel in September 1970 about the possibility of constructing a specialty sports car with Opel components.

Negotiating with Reisner on behalf of Opel was Robert Lutz, Opel's general sales manager and a member of the Opel board of directors. Lutz was initially interested in Reisner using Opel Diplomat parts in constructing the Italia. The Diplomat had a stodgy image in Germany, and Lutz thought that the sale through Opel dealers of a high performance Italian sports car made with Diplomat parts would generate favorable publicity and showroom traffic for the Diplomat. Thus, at a meeting held on September 4, 1970, at Opel headquarters in Russelsheim, Germany, Lutz, Reisner, and Bitter agreed orally that Reisner would design a car to be built around Opel components. This agreement was never reduced to writing. They arranged that Reisner would build a prototype and two cars in time for the Geneva Auto Show the next year.

Bitter was brought into the deal as Reisner's German distributor, through a new company set up for this purpose, Bitter GmbH & Co. To further insure Bitter's interest in the project, Reisner arranged to have all the Opel components and engines sold directly to Bitter GmbH & Co., which they then supplied to Reisner. With minor exceptions, all the sales of parts and engines were handled in this manner.

At some point, the parties agreed that Reisner would build an all new car using Opel parts and engines. This car was called the Indra. The Opel components to be used in the Indra included drive train components, the brakes, steering wheel and column, and the suspension. Lutz agreed also to supply Reisner with the engine used in the Opel Diplomat, the Chevrolet 327 cubic inch displacement (CID) engine. This was a "dirty" engine, that is, it did not satisfy the

emission control requirements for sale in the United States. Reisner was interested eventually in exporting the Indra to the United States, and he secured from Lutz a promise that Opel would provide the "clean" 350 CID engines used in the Corvette. Specifically, Lutz told Reisner that "I am pushing for that engine, and as a temporary measure use the 327. And I'll make sure you get the 350". Despite Lutz's promise, at no time did Opel use the 350 CID engines in its own cars or have any available for sale to Reisner or to anyone else.

In any event, the Indra could not have been exported to the United States in 1970 because the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381 *et seq.*, imposed safety requirements on cars sold in the United States that the Indra did not satisfy. Not until late 1972, when the "Checker Amendment" was enacted, providing an exemption for manufacturers of fewer than 10,000 cars per year, did it become possible for Reisner to export the Indra to the United States. To do so, however, required a "clean" engine, and the Indra equipped with the 327 CID engine did not meet the Federal emission standards.

Following the meeting with Lutz and after further consultations with Opel personnel, Reisner set up a production line for the Indra. To do so, he had to dismantle the production line for the Italia. The first Indra was shown at the Geneva Auto Show in the spring of 1971 where it attracted considerable favorable publicity and many orders. However, many of the early Indras were defective and dealer enthusiasm fell off. Nonetheless, 78 Indras were manufactured in 1971–72 and sold in Europe. All were equipped with the 327 CID engine.

Reisner first attempted to acquire the "clean" 350 CID engine in the spring of 1972, when it began to appear that the Checker Amendment might pass. Reisner's first contact was with General Motors Italia SpA, the Italian subsidiary of GM. On May 18, 1972, Reisner sent a letter to Ing. E. Brunati at GM Italia stating that Reisner produced about 150 cars per year and would like to purchase the 350 CID engines in lots of twenty. At that time, and indeed since 1965, the policy of GM's Chevrolet Division was not to sell engines on an original equipment basis in lots of less than 200.

Reisner's letter was referred to William Drury of General Motors Overseas Operations, which managed GM's overseas business interests in the early 1970's. Drury consulted with Rudy Boniface, the new director of sales at Opel, who told Drury that Reisner could not meet the minimum sales requirement. Drury next consulted with the manager of the Special Products Section of Chevrolet, which made the 350 CID engines in question, and he confirmed that Chevrolet continued to require a minimum order of 200 engines. Accordingly, on July 2, 1971, Drury wrote to Boniface at Opel, directing him to inform Reisner that Reisner's request to purchase the 350 CID engines in lots of twenty failed to satisfy the minimum purchase requirement. On July 28, 1972, Opel sent a letter to Reisner that stated: "Because of the low volume involved your Company will not be able to qualify for OE [original equipment] status with Chevrolet". However, the letter went on to assure Reisner that Opel would continue to supply him, through Bitter GmbH & Co., with the Opel engines and components that it had supplied in the past.

Undaunted, plaintiffs continued their efforts to purchase the "clean" 350 CID Corvette engine, without which they could not export the Indra to the United States. In early 1973, Joseph Vos, who became president of plaintiff Indra Imports, Inc. after its incorporation in 1973, made a series of phone calls to General Motors personnel in the United States to inquire whether Reisner could purchase a small quantity of 350 CID engines. However, Chevrolet refused to alter its minimum purchase requirement.

Vos eventually reached Frank Duca, the head of manufacturing sales for the Chevrolet Division. Duca contacted Drury, who in turn asked Boniface at Opel whether Opel wished to see the Indra equipped with the 350 CID engines for sale either in Europe or America. Boniface responded in a

telex dated March 16, 1973, that "Opel would not approve use of engines other than the Chevrolet 327 cubic inch on the Indra". Boniface added that the Indra's "quality has been consistently poor with performance and safety of vehicle questionable. We question the viability of project [sic] and do not feel it to be in the best interests of Opel or the Corporation to expand our engagements with Reisner". By separate letter of the same date, Boniface assured Reisner that Opel would continue supplying Opel component kits and the 327 engines. Reisner, through his attorney, then threatened GM with an antitrust suit unless it agreed to sell him the 350 CID engines "in quantities of 25 to 50 per order". On August 17, 1973, GM refused this request.

As it became clear in late 1972 and early 1973 that GM would not sell him the 350 CID engine in the quantities he desired, Reisner prepared to use a "clean" Ford 351 CID engine instead. As powerful as the Corvette 350 CID engine, the Ford engine was equipped with emission control devices and could be used in Indras built for export to the United States. However, Reisner's plans to use the Ford engine were thwarted when, in February, 1973, Opel informed Reisner that it would not supply him with Opel components for use with engines made by other manufacturers. In a letter to Reisner dated February 13, 1973, Boniface stated: "Opel is willing to continue to supply mechanical components for the INDRA car through Bitter GmbH. The sets will consist of the same prices and materials in the past". This letter was followed on February 23 with a letter to Bitter (copy to Reisner) from A. A. Cunningham, Opel's managing director, objecting vigorously to Reisner's plans to put a Ford engine in the Indra. Cunningham wrote that Opel could not accept such plans "for safety and technical reasons". He emphasized that "we have to make it very clear that we would be forced to discontinue the supply of Diplomat components for the INDRA immediately should these plans be realized". After these exchanges, Opel sold two more 327 CID engines to Reisner in July 1973; these were the last sales Opel made to Reisner.

Plaintiffs filed their initial complaint on May 19, 1976, charging defendants GM and Opel with two counts of violating the Sherman Act, Section 1 and 2. By stipulation with the defendants, the plaintiffs filed an amended complaint on July 11, 1977. The amended complaint essentially restated the original complaint's allegations under the Sherman Act and added a tying claim under Section 3 of the Clayton Act, 15 U.S.C. § 14.

As amended, the complaint alleges that GM and Opel "sought and caused the elimination of Plaintiffs as competitors in the sub-market for the sale of luxury and specialty cars in the United States". They allegedly did this by conspiring to and refusing to sell Opel components to Reisner unless he also bought the 327 CID engine; by refusing to sell the "clean" 350 CID Corvette engines to Reisner after inducing Reisner to convert his production facilities to the manufacture of Indras with the promise that Opel would supply Reisner with pollution-free engines; and by refusing to sell Opel components to Reisner for use with non-Opel or non-GM engines. These acts effectively precluded Reisner from selling the Indra in the United States, and thereby injured Reisner and his American importer, plaintiff Indra Imports, Inc. The market that GM allegedly sought to monopolize was the "luxury and specialty car market in the United States", which "GM, through its Cadillac division, dominates and has since prior to 1970 dominated . . . each year (selling) more than sixty percent of the new luxury and specialty cars in the United States".

Two months after filing the complaint, Reisner served interrogatories on GM seeking, in part, detailed data relating to market definition and GM's contentions as to the relevant market. The interrogatories asked GM to define "in the context of the automobile industry" the following: "Market"; "geographic market"; "product market"; and the relationship between "geographic" and "product market". It further asked GM to identify "each geographic

market, if any, which the United States contains" and "each of the product markets, if any, which the United States contains". For each such market, GM was asked to identify those in which it competed and the "nature" of its competition. GM objected to this entire line of questions as "indefinite, vague and ambiguous". As to the interrogatories asking GM to identify such things as "each car manufacturer whose products were sold in any market in which products made by [GM] were also sold" or "each market in which [GM products] . . . competed" and each other product (including products manufactured by other manufacturers) which competed with GM products, GM objected on the grounds that the questions were unduly broad, ambiguous and "not reasonably calculated to lead to the discovery of admissible evidence". The record does not indicate that Reisner sought any orders from the court compelling GM to answer these interrogatories.

On August 24, 1979, GM served on Reisner a second set of interrogatories seeking information concerning Reisner's market and submarket definitions, the defendants' alleged market power, and the alleged impact of defendants' conduct on the relevant market or submarket. On September 28, 1979, Reisner returned his answers, most of which stated that Reisner lacked the information to respond to the questions or that the information sought was in GM's hands. GM then filed a motion to compel Reisner to answer, which motion Magistrate Sinclair granted on October 29, 1979. On November 9, 1979, Reisner moved before Judge Goettel to vacate Magistrate Sinclair's order. Judge Goettel affirmed the Magistrate's order, noting that "market analysis is a necessary and indispensable part of [a monopolization] charge". He added that "if plaintiffs wish to withdraw their monopolization claims, the interrogatories need not be answered".

Reisner subsequently filed supplementary answers to GM's second set of interrogatories which GM found unsatisfactory. For example, in response to the question as to the specific models of cars with which the Indra was intended to compete in the United States, Reisner listed over thirty models and added "all other makes and makers of automobiles sold in the United States". Consequently, on November 30, 1979, defendants moved for an order of preclusion against Reisner's monopolization claims under Section 2 of the Sherman Act.

Reisner's opposition to GM's motion to preclude took two forms. On December 18, 1979, Reisner filed a motion for leave to file a second amended complaint. The Notice of Motion stated that the purpose of amending the complaint was to "eliminate vexatious issues under Section 2 of the Sherman Act (15 U.S.C. Section 2), which are raised therein and which have taken up the time of the Court and the parties out of all proportion to their importance in this case". In his memorandum of law in support of plaintiffs' motion for leave to file a second amended complaint, Reisner emphasized that plaintiffs were dropping their Section 2 claims, conceding that "[t]he end of plaintiffs' pursuit of those charges was probably, on the basis of hindsight, inevitable from the start. . . ." Meanwhile, on December 17, 1979, Reisner had served a memorandum in opposition to defendant's motion to preclude, arguing, in essence, that defendants' motion was moot because Reisner's monopolization claims had been withdrawn. Specifically, Reisner stated:

> "Plaintiffs, by their Motion for Leave to File a Second Amended Complaint, have withdrawn said monopolization claims. Consequently, there can be no further basis for sanctions against plaintiffs because of a failure to answer interrogatories they are not required to answer."

Besides dropping the monopolization claims, the second amended complaint added new allegations of a group boycott. Although no new defendants were named, Paragraph 26(b) alleged that "Defendants financed automobile manufacturing enterprises to compete with REISNER and to deprive REISNER of engines and parts critical to the production of the INDRA." Paragraph 26(c) added that "Defendants di-

verted said critical engines and parts away from REISNER to an automobile manufacturing enterprise which defendants were financing". These cryptic claims apparently arose out of Reisner's discovery in July 1979 that Opel had secretly financed a project with Erich Bitter during 1971–73 to develop a specialty sports car to compete with the Indra. Reisner did not learn of this joint venture between Opel and Bitter until July 10 and July 20, 1979, when GM turned over documents evidencing Opel's investment in Bitter's project.

Reisner's memorandum of law in support of the motion for leave to file a second amended complaint offered no justification for adding any new factual allegations. Indeed, the memorandum asserted that the second amended complaint merely "amplified and clarified the conspiracy allegations" contained in the first amended complaint. The "ultimate issue", said Reisner, is "whether or not GM and Opel engaged in unlawful conspiracy, in violation of Section 1 of the Sherman Act".

In his opinion of March 30, 1981, Judge Goettel denied the motion for leave to file a second amended complaint. For one thing, he found that "[n]o justification for the delay in presenting these new factual allegations and this new theory of recovery is given in the plaintiffs' memorandum in support of their motion". Next, Judge Goettel found that allowing a new complaint to be filed after discovery had been completed on the prior complaint and a motion for summary judgment prepared on the basis of that discovery "would be both prejudicial to the defendants and wasteful of the time of the Court and the attorneys". Finally, Judge Goettel said that the boycott claim appeared meritless:

> "It would be pointless for the Court to allow the plaintiffs to pursue yet another antitrust theory—in accordance with new facts—in what appears to be essentially a contract dispute.... This seems to be a particularly inappropriate case in which

to find ... an intra-enterprise conspiracy."

On the motion for summary judgment, Judge Goettel treated the complaint essentially as stating a tying claim, which he found unsupported in the record. He made no determinations with respect to the monopolization claims, stating only that "the plaintiffs have withdrawn those claims and the Court deems them withdrawn". For the same reason, he held that the defendants' motion to preclude evidence as to the monopolization claims was moot.

Plaintiffs do not appeal from the dismissal of their tying claims or the denial of their motion for leave to file a second amended complaint. Rather, plaintiffs argue that the district court erred in dismissing their claims under Section 1 and 2 of the Sherman Act. Plaintiffs' basic allegation on appeal is that "General Motors, Opel, and a German automobile importer, Bitter GmbH, conspired, in violation of the anti-trust laws, to drive plaintiffs out of business to protect General Motors' sports-car market in the United States". Although the amended complaint contains no allegations about any conspiracy involving Bitter, plaintiffs argue that GM's suppression of the evidence of Bitter's ties to Opel until July 1979 permits plaintiffs to prove the third-party conspiracy without formal amendment of the complaint. Reisner further argues that even without Bitter, the conspiracy between GM and its wholly-owned subsidiary, Opel, violated Section 1 of the Sherman Act. Next, Reisner claims that the monopolization claims are still in the lawsuit because the district court denied leave to file the second amended complaint, which would have dropped the Section 2 claims. Finally, even if plaintiffs waived some or all of these claims below, Reisner argues that we may hear them in the interests of justice.

We hold, first, that plaintiffs waived their claims under Section 2 of the Sherman Act, and that it would not be in the interest of justice to reinstate those claims on appeal.[1] Second, we hold that Reisner's failure

---

1. Plaintiffs were represented in the district court by a solo practitioner, Mr. Nick C. Spanos. Shea & Gould entered this case on the appeal.

to raise in the district court the claim of suppression of evidence of the alleged "Bitter conspiracy" bars him from raising that claim here. Moreover, we find the alleged "Bitter conspiracy" to be utterly without support in the record. Hence, we decline to remand for trial of the Bitter conspiracy claim. Finally, we hold that GM and Opel did not violate Section 1 of the Sherman Act by refusing to sell "clean" Corvette 350 CID engines to Reisner or Opel components for use with Ford 351 CID engines.

## II.

Proof of a relevant product market or submarket is required to state a claim of monopolization or attempted monopolization under Section 2 of the Sherman Act. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 840 (2d Cir. 1980). Here, GM repeatedly sought to have Reisner state exactly what product market that he alleged GM to have power in and what market GM sought to monopolize. GM was entitled to discovery of Reisner's factual allegations concerning the relevant markets so that GM could prepare its defense. However, the record discloses that Reisner continually changed his allegations concerning the relevant markets and failed to answer properly GM's interrogatories.

The amended complaint referred to the "luxury and specialty car sub-market", which it defined to include cars such as the Ferrari, Lotus, Lamborghini, Cadillac, Mercedes, and Lincoln-Continental. Seeking to clarify the exact sub-market that Reisner would attempt to prove at trial, GM served its first set of interrogatories, asking whether Reisner contended that the manufacture, distribution, and sale of "luxury and specialty" cars constituted one or three separate product markets or if one was a submarket of another. Reisner responded: "Theoretically and depending on your point of view all three propositions in the Interrogatory can be answered yes". To call this response evasive would be an understatement.

During the deposition of Reisner in 1979, GM again attempted to pin down the market alleged by plaintiffs. This time, Reisner referred to a "luxury sports car market", in which he included such cars as the Maserati Ghibli, Ferrari, Jensen, and Iso, but not the Corvette. The second set of interrogatories that GM served in 1979 was intended to clarify the difference between the "luxury and specialty car market" identified in the amended complaint, and the "luxury sports car" market identified during Reisner's deposition, as well as to force Reisner to specify the basis for his claim that these could constitute markets for antitrust purposes. Reisner's supplemental answers to these interrogatories listed over thirty sports cars against which the Indra was intended to compete, including the Corvette, as well as "all other makes and models of automobiles sold in the United States". This hardly constituted an adequate specification of the market Reisner intended to prove at trial.

Faced with Reisner's constant shifting and refusal to specify the relevant markets in which the Indra competed or in which GM held market power, GM moved to preclude plaintiffs from introducing any evidence in support of their monopolization claims other than that already contained in the record. In opposition to that motion, plaintiffs told the court that they had "withdrawn said monopolization claims". Relying on that representation, the district court held that defendants' motion to preclude was moot. In this context, it is irrelevant that the district court denied the motion for leave to file the second amended complaint, which omitted the Section 2 claims. Plaintiffs' representation to the court that the monopolization claims had been withdrawn was not conditioned on the court granting the motion to file the second amended complaint. Therefore, the district court properly found that the claims under Section 2 of the Sherman Act had been withdrawn and waived.

Nor have plaintiffs shown that it would be in the interest of justice to reinstate the monopolization claim. On the contrary, the claim appears meritless. Because of the paucity of evidence in the record—due principally to Reisner's failures to respond properly to GM's interrogatories—we can only speculate as to the relevant markets. Even so, we can imagine no

relevant market in which the Indra was intended to compete in which GM had achieved monopoly power or was dangerously close to doing so. In the sports car market, the Corvette was only one of many cars in the market. Moreover, the Corvette was in a substantially lower price range than the Indra. Although the Cadillac was in the right price range to compete with the Indra, it was a sedate sedan, whereas the Indra was a high performance sports car. In short, we think it unlikely that the Indra and the Cadillac or Corvette would have been viewed by potential buyers as "reasonably interchangeable". *See United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). In asking this Court to reinstate the monopolization claim waived below, the plaintiffs bore the burden to show the merits of that claim, and we find that the plaintiffs have failed to carry that burden here.

■ Next, plaintiffs claim that Bitter, GM and Opel engaged in a conspiracy to prevent Reisner from exporting cars to the United States. Although he did not raise this claim in the district court, Reisner argues that we may review the merits of this claim because evidence of this "Bitter conspiracy" was suppressed by GM and Opel. Moreover, plaintiffs claim that GM's suppression of this evidence permits them to prove the "Bitter conspiracy" at trial without formally amending their complaint. However, plaintiffs' failure to raise the claim of suppression in the district court bars them from raising here either that claim or the underlying claim that Bitter conspired with GM and Opel.

Reisner alleges that GM failed to disclose evidence of the "Bitter conspiracy" until July of 1979, after plaintiffs had already deposed Bitter. Following this disclosure, Reisner filed his motion for leave to file a second amended complaint. The proposed second amended complaint contained an oblique reference to "automobile manufacturing enterprises" that the defendants had allegedly "financed . . . to compete with Reisner". Nowhere was Bitter mentioned by name. Nor did plaintiffs' motion for leave to file the second amended complaint or counsel's affidavit in opposition to defendants' motion for summary judgment (which is dated March 10, 1980) mention anywhere either the suppression of evidence about Bitter or even the allegation that the conspiracy included Bitter. Because plaintiffs had the opportunity to raise the suppression claim in the district court, and failed to do so, they are barred here.

■ Moreover, we find that the allegations that Bitter conspired with Opel and GM to be fanciful and without support in the record. Essentially, Reisner argues that conspiracy can be inferred from the following facts: (1) Opel had invested in a project with Bitter to build a car that would compete with the Indra and (2) Bitter, to whom Opel sold the components and engines destined for Reisner, never objected when Opel breached its promise to supply the 350 CID engine to Reisner and decided not to supply Opel components for use with non-Opel engines. From these facts, Reisner argues that we can infer that Bitter agreed to help GM and Opel prevent Reisner from exporting cars to the United States, in return for which Opel helped Bitter build a car to compete with the Indra in Europe. However, there is no plausible motive for such a conspiracy. Neither GM nor Opel needed Bitter to effectuate their determination not to deal with Reisner. GM simply refused to sell the 350 CID engines to Reisner. Likewise, Opel told Reisner—through the copy that it sent him of the letter sent to Bitter—that it would not supply Opel components for use with the Ford 351 engine. Finally, plaintiffs cite no evidence indicating that Bitter took any action, or indeed, could have taken any action, to prevent Reisner from getting the equipment that he needed. Bitter's failure to protest Opel's or GM's refusal to deal with Reisner on the terms that Reisner wanted is insufficient evidence to support an inference that Bitter conspired with GM and Opel. Hence, we find that it would not be in the interests of justice to permit plaintiffs to pursue this claim at trial.

Reisner's remaining claim, that GM and its wholly-owned subsidiary, Opel, conspired in violation of the Sherman Act to exclude him from the United States market, is likewise without merit. What the record discloses here is a commercial venture that went sour. At most, the evidence shows that Opel breached two promises to Reisner. It failed to sell him the 350 CID Corvette engines that Lutz assured Reisner he would get. And it unilaterally stopped supplying Reisner with Opel components and 327 CID engines in late 1973. Reisner's effort to convert what is essentially a claim sounding in contract into an antitrust conspiracy claim is unavailing because the basic premise of this alleged plot is simply incredible. *See Diehl & Sons, Inc. v. International Harvestor Co.*, 426 F.Supp. 110, 117 (E.D.N.Y.1976). If Opel desired to eliminate or exclude Reisner from competing either with GM in the United States or with Bitter in Europe, then it would not have made the Indra possible in the first place. The antitrust laws were "not designed to police the performance of private contracts", *Madison Fund, Inc. v. Charter Co.*, 406 F.Supp. 749, 751 (S.D.N.Y.1975), and Reisner's disappointment with Opel's performance of its alleged agreements is not redressable under those laws.

Finally, neither GM's refusal to supply Reisner with the 350 CID Corvette engine nor Opel's refusal to supply Opel parts for use with Ford engines support an inference of conspiracy. GM never agreed to sell the 350 CID engines to Reisner. It had sole control over those engines and was well within its rights, see *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), in refusing to sell them to Reisner in lots of less than 200. Likewise, GM violated no law by seeking the advice of its subsidiary as to the possible disadvantages of dealing with Reisner or in communicating its unilateral refusal to deal with Reisner through Opel. Nor is there any evidence that Opel's refusal to sell Opel components for use with Ford 351 engines was the result of an agreement with GM or for any reason other than its own commercial interests. The record discloses that Opel had some concerns about the safety of the hybrid car. More important, Opel's purpose in entering the Indra project with Reisner was to garner favorable publicity for the Opel Diplomat. Selling Opel parts for use in a Ford-powered car would have frustrated that purpose; therefore, Opel was perfectly justified in refusing Reisner's request.

Affirmed.