**MARTIN ICE CREAM CO., Plaintiff,**

v.

**CHIPWICH, INC., and Premium Products Sales Corporation, Defendants.**

No. 82 Civ. 1621 (GLG).

United States District Court, S.D. New York.

Jan. 7, 1983.

Thal & Youtt, New York City, for plaintiff; Steven H. Thal, New York City, of counsel.

Pavia & Harcourt, New York City, for defendant Chipwich; Frances B. Bernstein, David A. Botwinik, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, and Warshavsky, Hoffman & Cohen, P.C., New York City, for defendant Premium Products Sales Corp.; Sanford M. Litvack, Doris K. Shaw, Kevin J. Walsh, James B. McKinney, Jr., New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Plaintiff Martin Ice Cream Co. ("Martin"), a distributor of ice cream products, brings suit against defendant Chipwich, Inc. ("Chipwich"), the primary manufacturer of the chocolate-chip-cookie-ice-cream-sandwich known as the Chipwich (hereinafter designated the "C-wich" to distinguish it from its manufacturer), and defendant Premium Products Sales Corporation ("Premium"), Chipwich's former exclusive sales agent, for allegedly illegally preventing

Martin from continuing as the exclusive distributor of C-wiches to all Pathmark and Shoprite supermarkets located in the New York Metropolitan area. In this action, Martin raises eight claims: five under the federal antitrust provisions of the Sherman and Robinson-Patman Acts, 15 U.S.C. §§ 1, 2, & 13 (1976), one for breach of contract, and two for tortious interference with contractual relations.[1]

At this juncture in this relatively young suit, defendant Premium has moved to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R. Civ.P. 12(b)(6), and defendant Chipwich has moved to dismiss on the pleadings, pursuant to Fed.R.Civ.P. 12(c). In considering these motions, however, the Court has, except with respect to the claim of tortious interference with contractual relations, relied upon not only the pleadings but also affidavits and exhibits submitted by all of the parties. Accordingly, the Court has treated both motions, pursuant to Rules 12(b)(6) and 12(c), respectively, as motions for summary judgment.

Consequently, the movants must meet the difficult burdens imposed under Fed.R.Civ.P. 56. They must "show that there is no genuine issue as to any material fact" and that they are "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court may determine only whether issues of fact exist; it may not pass any judgment on the quality of the proof by trying such factual issues. See, e.g., Wilson-Rich v. Don Aux Associates, Inc., 524 F.Supp. 1226, 1229 (S.D.N.Y.1981). Moreover, it must draw all reasonable inferences in favor of the party opposing the motion, Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980), which in this case is Martin. In addition, summary disposition of antitrust claims is generally considered to be undesirable. See, e.g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486,

---

1. The pleading of so many diverse legal theories arising from the simple factual setting that is presented suggests a complaint in search of a cause of action. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1337 (1976 and Supp. V 1981), and under the principles of pendent jurisdiction.

491, 7 L.Ed.2d 458 (1961) ("[S]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot"). Finally, where there has been almost no discovery, as is the case here, courts have held that, even if summary judgment might be granted, the better course is to deny the motion without prejudice to renewing it after further discovery is completed. 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2728, at 558 (1973).[2]

Considering the defendants' motions under these stringent standards, the Court has concluded that, for reasons given below, the motions must be denied with respect to all but the claim of tortious interference with Martin's contractual relations, which is dismissed with leave to amend the complaint. However, in the interests of fairness to the defendants and expeditious litigation of the case, the denial of these motions with respect to the other seven claims is made without prejudice to the defendants' right to renew the motions upon the completion of further discovery.[3]

## I. BACKGROUND

The *raison d'etre* of this case is the C-wich. Created by Richard La Motta, a primary founder of Chipwich, the C-wich has become a trademarked, mass-produced, commercial success of the first order. The primary corporations behind the development of this commercial success have been Chipwich and Premium. The former is the manufacturer of the C-wich, while the latter is a small, supposedly expert sales and marketing firm, which contracted to provide Chipwich with the marketing and sales mechanism that it needed to reach a large market. While the complete interrelationship of Chipwich and Premium and their officers and shareholders has not been fully detailed in the affidavits, the submissions to date do reveal at least the broad outlines of what appears to be a somewhat complex interlocking of organizations. At the minimum, the following contractual relations appear to have been created:

1. On January 16, 1981, Chipwich signed a consulting agreement with Bruce Nevins, one of the principals of Premium and an original, major stockholder in Chipwich, by which Nevins was to receive $2,000 per month for two years for performing at least one day per month of consulting services;

2. A few weeks later, Chipwich signed a similar consulting agreement with Jim Stevens, the other principal of Premium and another original, major stockholder in Chipwich;

3. On March 27, 1981,[4] Chipwich signed a contract with Premium, by which Premium agreed to be the exclusive sales and marketing agent for the C-wich and Chipwich agreed to pay 14% of the gross sales orders taken by Premium;

4. On May 12, 1981, Chipwich and Premium entered an agreement under which Mr. Stevens became the acting president and chief operating officer of Chipwich.

All of these relationships existed during the period relevant to this action but were terminated at the insistence of Chipwich on March 5, 1982.

---

**2.** It should be noted, however, that even in cases involving antitrust claims, courts are not hesitant to grant summary judgment when they are certain that extensive discovery has been completed and any doubt of the existence of a genuine issue of fact eliminated. *See, e.g., Reisner v. General Motors Corp.,* 511 F.Supp. 1167, 1174 (S.D.N.Y.1981), *aff'd,* 671 F.2d 91 (2d Cir.1982).

**3.** It appears that, to date, the defendants have provided Martin with some of the documents it requested, and that it has had access to and, at least in part, submitted to the Court other documents filed in a largely unrelated action between Premium and Chipwich, *Premium Products Sales Corp. v. Chipwich, Inc.,* 539 F.Supp. 427 (S.D.N.Y.1982), which apparently has since been settled.

**4.** Although Martin originally alleged that this agreement was made in November 1981, the plaintiff now all but concedes that the correct date is March 27, 1981, which is the date written on the copy of the agreement that has been submitted to the Court by the defendants.

When the C-wich was first introduced to the public in May of 1981, it was sold only from ice cream carts. However, it took little time for Chipwich and Premium to realize that the public demand for the C-wich would be almost insatiable. Ever since, Chipwich has been trying, at first with the help of Premium and later with the assistance of other firms, to create a marketing and sales mechanism to meet the extraordinary demand for C-wiches.

To that end, Chipwich and Premium began negotiations with Haagen Dazs Ice Cream, Inc. ("Haagen Dazs"),[5] to obtain the benefit of its distribution network. An agreement seems to have been reached by early November 1981, under which Haagen Dazs became, with certain exceptions, the exclusive distributor of C-wiches in the New York Metropolitan area. For purposes of this action, the key exception to this exclusive arrangement was that retail outlets, primarily supermarkets, that were not directly serviced by Haagen Dazs would be serviced by Haagen Dazs's three surrogate ice cream distributors, namely: Priscilla Ice Cream Company ("Priscilla"), LaSalle Ice Cream Company ("LaSalle"), and Martin.[6] Thus, the plaintiff alleges that Haagen Dazs, Martin, Priscilla, and LaSalle, who together are referred to as "the Haagen Dazs distribution network," were to be the exclusive distributors of C-wiches to all shopping markets in the New York Metropolitan area.

More specifically, Martin claims that early in November of 1981 principals of Chipwich met with representatives of Martin, Priscilla, and LaSalle and struck an oral agreement with regard to the new distribution system. By that agreement,[7] Martin alleges, the three distributors were made the exclusive distributors to all institutions not covered by Haagen Dazs, and Martin, in particular, was designated the authorized distributor to four supermarket chains: Pathmark, Shoprite, Foodtown, and Acme. The agreement called for Martin and the other two distributors to buy C-wich "multipacks" from Chipwich at $8.52 per "shipping unit" and to sell them to retailers at the suggested wholesale price of $11.15 per "shipping unit."[8]

Chipwich disputes the nature of whatever agreement, if any, that it may have made with Martin at the early November meeting.[9] Most critically, Chipwich denies that it merely "desired" Martin to make "store-door" deliveries; rather, Chipwich contends that it "demanded" such deliveries and prohibited the delivery of C-wiches to any chain's warehouse distribution center.[10] In effect, Chipwich is claiming that a material

---

**5.** Haagen Dazs is the manufacturer of a line of very popular and commercially successful premium ice cream products, which are sold at Haagen Dazs ice cream shops as well as at supermarkets and other retail outlets.

**6.** Although the plaintiff has presented merely a draft version of the Chipwich-Haagen Dazs contract, the Court assumes, as it must, that the non-movant plaintiff's assertion that the contract was entered into is in fact true.

**7.** Martin has submitted copies of various promotional releases and letters from Chipwich and Premium, which, Martin claims, establish in writing the terms of the alleged oral agreement, including prices at the wholesale and retail levels and the "exclusive" nature of Martin's right to distribute to designated supermarket chains.

**8.** A "shipping unit" or "unit," consists of 24 C-wiches. A "multipack" consists of three C-wiches packaged in a box, which is to be marketed in supermarkets and later sold for consumption in the home. Thus, a multipack ship-

ping unit consists of eight multipacks, each with three C-wiches. A single pack shipping unit, in contrast, is comprised of 24 individually wrapped C-wiches, which are to be sold and consumed at restaurants, stadiums, carts, etc. The price of a multipack C-wich is less than that of a single pack C-wich at all levels of the distribution system.

**9.** For purposes of this motion only, the Court assumes that Chipwich was represented at the alleged meeting, though the defendant disputes even that aspect of Martin's claim.

**10.** A "store-door" delivery occurs when a distributor delivers a product directly to a retail store, checks that it is stocked on the shelves, and insures that it is properly handled and exposed to the retail customer. More expensive than a warehouse delivery, the store-door delivery was sought by Chipwich to ensure the quality and promotion of the perishable C-wich.

term of the agreement was that only store-door deliveries be made, while Martin denies that such was a term of the agreement.

Pursuant to the alleged agreement, Martin began within two or three weeks to contact its "designated" supermarket chains and to make sales to them. It made only warehouse deliveries, however, to Pathmark because that company refused to take deliveries at its individual stores. Martin alleges that it made these deliveries, knowing that Chipwich preferred store-door deliveries only because Martin hoped thereby to persuade Pathmark to accept at a later time what Chipwich wanted. To the other three supermarket chains, Martin apparently did make store-door deliveries. While it sold to the latter three chains at Chipwich's suggested wholesale price of $11.15 per unit, it sold to Pathmark at a discount price of $10.00 per unit.

According to Martin, when the defendants learned of its successful discount sales to Pathmark's warehouse, they chose to punish Martin, increase their own profit margins, and discourage the other distributors from discounting by taking the sudden and unannounced step of making direct sales to Pathmark. In addition, once they learned that such sales could also be made to Shoprite, the defendants began selling directly to Shoprite's new warehouse distribution system. This latter step was allegedly taken despite the fact that Martin had been making store-door deliveries to Shoprite, as Chipwich had requested.[11]

Since the beginning of 1982, Martin has made sales only to Foodtown and Acme. Pathmark and Shoprite apparently have had an economic incentive to buy directly from Chipwich because the manufacturer sold to those two chains at a price of $9.27 per unit. This price, which was $.73 less than Martin's discount price, was considerably lower than what Martin could afford to offer the chains.

On the basis of these facts and others, which are described when necessary later in the opinion, Martin has alleged the following causes of action:[12]

1. that by making direct sales to the two chains Chipwich breached its exclusive distribution agreement with Martin;

2. that Chipwich and Premium conspired to unreasonably restrain trade by, inter alia, establishing a resale price maintenance scheme and thereby violated section 1 of the Sherman Act;[13]

3. that either Chipwich by itself or Chipwich and Premium in concert attempted to monopolize trade in C-wiches and thereby violated section 2 of the Sherman Act;

4. that Chipwich sold its products to Premium at prices lower than those offered to Martin and thereby violated section 2 of the Robinson-Patman Act by engaging in price discrimination;

5. that Chipwich and Premium tortiously interfered with Martin's contractual relations with Pathmark and Shoprite; and

6. that Chipwich and Premium tortiously interfered with the economic advantage that Martin had developed with its Pathmark and Shoprite accounts.

Each of these claims is considered at length in the discussion that follows.

## II. DISCUSSION

### A. Breach of Contract Claim

■ The essence of this claim is that Chipwich entered into an exclusive distribu-

---

**11.** No one has challenged the effectiveness of Martin's marketing during the period in question, which appears to have accounted for 27% of all sales of C-wiches to supermarkets in the New York Metropolitan area.

**12.** Although presented in a different order than that found in the complaint, Martin's claims are listed here in the order in which logic compels them to be analyzed in the discussion that follows.

**13.** The plaintiff actually presents two section 1 claims, one alleging a vertical restraint of trade and the other a horizontal restraint, but the defendants have chosen to address the claims as if they were one and, thus, so has the Court. Similar treatment is given to the two original section 2 claims for the same reason.

torship agreement with Martin by which it was to distribute C-wich multipacks to all Pathmark, Shoprite, Foodtown, and Acme stores in the New York Metropolitan area, and that Chipwich breached the agreement by initiating direct sales to Pathmark and Shoprite at prices below those that Martin could afford to match. In response, Chipwich moves for a dismissal of this claim on four separate grounds, namely: (1) that Martin has failed to claim an exclusive right to sell to Pathmark and Shoprite; (2) that Martin has failed to claim a right to make warehouse deliveries, as opposed to store-door deliveries; (3) that, because there was no written contract, any agreement that was entered into must have been an "at will" agreement, at best, which could have been terminated at any time by either party; and (4) that any contract that Martin may believe was created was, in fact, merely illusory because there was no mutuality of promises between the parties.

Having carefully considered each of these grounds, the Court must conclude that none of them is sufficient to grant the defendant's motion at this stage in the proceedings. With regard to the first ground, Chipwich is simply not correct in saying that Martin has failed to allege an exclusive right to sell to Pathmark and Shoprite. The plaintiff first alleges that Priscilla, LaSalle, and Martin were appointed the exclusive distributors of C-wich multipacks in the New York Metropolitan area, and then claims that Martin was designated and authorized to introduce and sell multipacks to four specific chains: Pathmark, Shoprite, Foodtown, and Acme. Complaint ¶¶ 14 & 15. Certainly these allegations and others made at other points in the complaint adequately inform Chipwich that Martin is claiming an exclusive right to sell C-wich multipacks to all of the four named supermarket chains. Whether it will be able to

prove such an exclusive right is another matter, requiring an evidentiary hearing.

With regard to the second ground, the Court finds that implied in Martin's general claim of an exclusive distributorship is the specific right to make warehouse deliveries. Although it is true that Martin nowhere expressly claims that it was given the specific right to make warehouse deliveries,[14] it is also true that Martin at no point admits that it was prohibited from making such deliveries. If the Court is to assume, as it must for the purposes of this motion, that Martin was granted an unlimited exclusive distributorship, then we cannot, in the absence of additional evidence, conclude that this general right was qualified by a reservation by Chipwich that Martin could make only store-door deliveries.

Finally, with regard to the third and fourth grounds, the Court finds that genuine issues of material fact as to the precise nature of the agreement preclude any determination of whether it was either an "at will" agreement or an illusory contract which lacked mutuality of promises. Faced with an oral agreement, every aspect of which appears to be in dispute, this Court is hardly in a position to divine the terms of the agreement or the intent of the parties, and must refuse, therefore, to decide the legal issues Chipwich raises in these final two grounds. It is impossible, for example, for the Court to determine whether there was mutuality of promises when what each party promised remains at issue.

Therefore, the Court must deny Chipwich's motion with respect to the claim of breach of contract.

### B. Two Claims of a Conspiracy to Restrain Trade

Defendants Chipwich and Premium argue that Martin's two claims of violation of

---

**14.** Should the plaintiff choose to amend its complaint, and the defendant, consequently, to amend its answer, the Court would not be disappointed if the respective parties more clearly addressed several issues, including: (1) the exact nature of the agreement or contract entered into by Martin and Chipwich; (2) whether Chipwich ever terminated such agreement with respect to Pathmark and Shoprite; (3) if so, whether Martin had a right to reasonable notice of termination and whether such notice was given; (4) whether Chipwich made any misrepresentations during its meeting of November 1981 with Martin and the other distributors; (5) whether issues involving the Statute of Frauds are raised herein; and (6) whether Chipwich is denying the existence of any agreement whatsoever.

section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), should be dismissed for any one of three reasons. Specifically, the defendants contend that Martin has failed to allege: (1) a combination or conspiracy within the meaning of the Sherman Act; (2) any instance of undue restraint of trade; and (3) any antitrust injury. While the Court concurs with the defendants that each of these elements must be proven if Martin is to prevail, *see, e.g., WIXT Television, Inc. v. Meredith Corp.,* 506 F.Supp. 1003, 1014 (N.D.N.Y.1980), it cannot agree that the elements are insufficiently pled or that Martin has failed to raise a genuine issue of fact as to any of them.

■ 1. *The Conspiracy.* The primary conspiracy alleged by Martin is that between Chipwich and Premium.[15] Martin has alleged that the two defendants conspired to maintain wholesale and retail prices by coercing Martin and the other distributors to sell only at the "suggested" price of $11.15 per unit. According to Martin, the direct sales made by Chipwich and Premium to Pathmark and Shoprite were undertaken to punish Martin for offering a discount price to Pathmark and to discourage the other distributors from making similar discount sales. Further, Martin alleges that Premium was a distributor who, by buying from Chipwich and selling to the supermarkets, was in competition with Martin.

In response, Chipwich and Premium argue that the only relationship between themselves was that of principal and agent: Premium, as the exclusive sales agent of Chipwich, merely played the same role that the marketing division of a larger company would have played. Premium denies that it ever bought or sold C-wiches and claims that it merely made a commission on whatever Chipwich sold to distributors or retailers. The defendants conclude on the basis of these facts that, under the doctrine most recently enunciated in *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1031–33 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979), they were incapable of conspiring within the meaning of the Sherman Act because they did not constitute two distinct economic entities for antitrust purposes.

Unfortunately, the defendants' reliance upon *Fuchs,* particularly at this early stage of the litigation, is misplaced. In *Fuchs,* the defendant manufacturer of sugar unilaterally decided to substitute an in-house brokerage system for the existing array of independent general brokers upon whom it had relied for marketing its products. Two of the fifteen original general brokers refused to sign voluntary termination agreements and brought a suit for violation of section 1 of the Sherman Act. They alleged that between Amstar and two of the other original brokers, who not only signed the termination agreements but also accepted an offer from Amstar to become its in-house brokers, there had been a conspiracy to restrain trade. The Court of Appeals held that the district court had been correct in its conclusion, *reached at the end of a three week trial,* that there could not have been a conspiracy between Amstar and the two brokers because they were, in effect, a single economic entity. *Id.* at 1031. However, in reaching that decision, the Second Circuit expressly relied upon several facts inconsistent with those in the instant case, including: (1) the fact that the brokers took

---

15. Secondarily, Martin has alleged in its reply brief and the affidavit of its attorney that there existed a combination or conspiracy between Chipwich, on the one hand, and Martin and the other distributors, on the other hand, the object of which was identical to that of the primary conspiracy—to maintain resale prices at an artificially high level. The Court does not rely on this alleged secondary conspiracy in reaching its decision herein. Nor should the Court, in fairness, consider such an allegation, for it is nowhere even suggested in the complaint. *See,* *e.g., Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.,* 518 F.Supp. 1100, 1109 (D.Conn.1982) (conclusory allegation raised outside of the scope of pleadings held to be insufficient to withstand motion for summary judgment), *aff'd,* 675 F.2d 502 (2d Cir.1981). Rule 15 of the Federal Rules of Civil Procedure provides the means Martin must employ if it wishes to amend its complaint and bring a matter not originally pled to the attention of the Court.

no part in the decision to change the distribution system; (2) the fact that only the manufacturer determined the prices; (3) the fact that the two brokers served no other function than to supply the manufacturer with customers; and (4) the absence of any claim of resale price maintenance. *Id.* at 1031–34 & n. 5. In contrast, we find in both the complaint and the affidavits of the instant case the suggestion that Chipwich and Premium jointly made the decision to sell directly to Pathmark and Shoprite and that the defendants jointly determined the "suggested" wholesale and retail prices. Furthermore, the very core of Martin's section 1 claim is that the two defendants were establishing a price maintenance scheme. Nor is it unforeseeable that further discovery could reveal that Premium performed for Chipwich several functions other than supplying the manufacturer with customers.

More generally, the defendants have not established that they were a single economic entity for antitrust purposes. Although there was, at the time in question, some overlap in the control and ownership of the two corporations, they seem to have been two separate economic entities, serving different customers and different commercial purposes. They do not appear to have embodied, as the defendants suggest, the type of relationship involved in, for example, *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455–58 (9th Cir.1979), where one individual was the sole owner of several corporate defendants and exercised such control over them that the corporations could not be considered separate economic entities for purposes of determining whether they were coconspirators under the Sherman Act.

Although a full evidentiary hearing may eventually reveal little more than the simple agency relationship that the defendants presently claim, the plaintiff has already presented facts sufficient to suggest the possibility of a much more complex relationship. Faced with a material issue of fact as to the exact nature of the ties between the defendants, the Court cannot at this juncture determine the legal issue that they have raised here.

■ *2. Unreasonable Restraint of Trade.* The critical illegal restraint of trade alleged by Martin is a resale price maintenance scheme under which the distributors were allegedly told to sell to the supermarkets at the suggested price of $11.15.

In *Butera v. Sun Oil Co., Inc.,* 496 F.2d 434 (1st Cir.1974), the Court of Appeals for the First Circuit articulated the elements of an illegal scheme of resale price maintenance, since adopted by other circuits, by holding:

[A] case of illegal resale price maintenance is made out when a price is announced and some course of action is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric 'coercion', but it must involve making a meaningful event depend on compliance or non-compliance with the 'suggested' or stated price.

*Id.* at 437 (footnotes omitted); *see also Carlson Machine Tools, Inc. v. American Tool, Inc.,* 678 F.2d 1253, 1261 (5th Cir. 1982); *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 53 (2d Cir.1980) (plaintiff must prove either an agreement to maintain prices or "the securing of actual adherence to prices by means beyond mere refusal to deal").

In this case, although Martin has not specifically alleged each of these elements, its complaint and affidavits together make a sufficiently strong showing to raise a genuine issue of fact as to the presence of each of them. The submissions suggest that Chipwich and Premium communicated to both wholesalers and retailers what the suggested or recommended prices were to be at every level of the distribution system. In addition, the complaint contains the allegation that Chipwich's sudden and apparently unannounced shift to direct sales to Pathmark and Shoprite was instituted to punish Martin for discount sales and to discourage the other distributors from making similar sales. Concededly, the com-

plaint contains no allegation that the critical "coercive" event in question—the implementation of direct sales and effective "termination" of Martin as a distributor to Pathmark and Shoprite—was made with Martin's knowledge that the "coercion" depended upon Martin's failure to adhere to the suggested prices. However, such a dependency can reasonably be inferred from the alleged facts. Furthermore, at this early stage in the discovery process, it would be rather difficult for Martin to have shown that the other distributors knew what happened to Martin or were threatened with similar action if they made warehouse deliveries or sold at discount rates. Certainly, the inference of their knowledge of the event and of their subsequent adherence to the suggested prices can reasonably be drawn from Martin's allegations.

■ 3. *Antitrust Injury.* Chipwich's and Premium's contention that no antitrust injury to competition is alleged fails to address the significance of Martin's factual allegations of a price maintenance scheme. Even if resale price maintenance were not a per se violation of the antitrust laws, *see, e.g., California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 102, 100 S.Ct. 937, 941, 63 L.Ed.2d 233 (1980); *Albrecht v. Herald Co.,* 390 U.S. 145, 151–52, 88 S.Ct. 869, 872, 19 L.Ed.2d 998 (1968), a reasonable inference of anticompetitive effect could be made from Martin's allegations, and the plaintiff, therefore, would have to be given an opportunity to develop facts that might prove such an effect. The defendants' reliance upon *Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co.,* 525 F.Supp. 749, 750 (E.D.N.Y.1981) (dismissal for failure "to allege facts showing injury to *competition* as distinct from injury to a *competitor*") is misplaced, for in *Jarmatt* the sole allegation relevant to a possible antitrust injury was that the defendant-manufacturer substituted another company for the plaintiff-distributor. *Id.* at 750. Here, not only has the manufacturer substituted itself for Martin in the role of distributing C-wiches to Pathmark and Shoprite, but also it has allegedly done so in furtherance of a scheme to maintain prices at an

artificially high level. Other cases cited by the defendants are similarly inapposite to the case at hand. *See, e.g., Speed Auto Sales, Inc. v. American Motors Corp.,* 477 F.Supp. 1193, 1196 (E.D.N.Y.1979) (dismissal of claim based on failure to allege conspiracy, exclusive dealership, or injury); *Neugebauer v. A.S. Abell Co.,* 474 F.Supp. 1053, 1067–69 (D.Md.1979) (failure to prove injury at the trial, not a case involving summary disposition); *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110, 119 (E.D.N.Y.1976) (summary judgment granted defendant, after completion of exhaustive discovery by both parties, where no more was shown than that one of twenty-four dealers in the geographic market was terminated by the manufacturer).

In conclusion, the defendants have failed to demonstrate that Martin cannot prove a violation of section 1 of the Sherman Act. Although the complaint is not as clear as it could be and the task the plaintiff has set for itself, if it is to prove what it alleges, may in the end prove too difficult for it to succeed, it is not for this Court at this time to go beyond the bare essentials of the pleadings and other submissions to decide whether the plaintiff has in fact, proven what it has alleged. The defendants' motions with respect to Martin's section 1 claims, therefore, are denied.

*C. Claims of Conspiracy and Attempt to Monopolize Trade*

■ Martin claims that either Chipwich by itself or Chipwich and Premium in concert attempted to monopolize the distribution of C-wiches in the New York Metropolitan area, thereby violating section 2 of the Sherman Act, 15 U.S.C. § 2 (1976). In response, Chipwich and Premium argue that they could not possibly have monopolized the relevant product market, which they contend is comprised of either all ice cream novelties, at its broadest, or all ice cream sandwiches, at its narrowest. They suggest that the Court take judicial notice of the fact that the market is as they define it and

dismiss the two section 2 claims.[16] In addition, they argue that one product cannot possibly constitute a relevant product market. Martin opposes the defendants' motions by arguing that the C-wich alone constitutes the relevant product market and that the case law supports the proposition that the product market can consist of only one product.

The Court, therefore, is faced with a colorable issue of material fact: what is the relevant product market in which the C-wich competes? The defendants do refer the Court to cases which have held that one product or another could not by itself constitute the relevant product market. *See, e.g., Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243, 271 n. 57 (E.D.Pa.1979) (Texaco brand gasoline held not to be a relevant product market), *aff'd,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Mogul v. General Motors Corp.,* 391 F.Supp. 1305, 1313 (E.D.Pa.1975) ("the relevant product market cannot be limited to Cadillac"), *aff'd,* 527 F.2d 645 (3d Cir.1976). However, the plaintiff has drawn the Court's attention to cases in support of the antithesis. *Jennings Oil Co., Inc. v. Mobil Oil Corp.,* 1979–2 Trade Cas. (CCH) ¶ 62,826 (S.D.N.Y. August 23, 1979) (motion for judgment on the pleadings denied because relevant market *might* consist solely of Mobil Oil products); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 121 (9th Cir.1972) ("A single manufacturer's products *might* be found to comprise, by themselves, a relevant market...."); *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1344 (9th Cir.1971) (issue of whether defendant's line of industrial sealants constituted relevant product market not disposed of on motion for summary judgment, but rather allowed to go to trial).

Considering the cases cited, the Court concludes that on the basis of the limited facts that the parties have presented about the effective area of competition, the interchangeability of C-wiches with other products, and Martin's ability to get similar products from other manufacturers, the Court is in no position to step into the fray and take judicial notice concerning a product it has never seen, much less consumed. Rule 201(d) of the Federal Rules of Evidence requires a court to take judicial notice only if the party requesting such notice has "supplied [the court] with the necessary information." Fed.R.Evid. 201(d). In the instant case, the information that is needed (to say nothing of the product itself) has not been submitted.[17] The C-wich in 1981 was a brand new product. How its introduction affected the ice cream sandwich and ice cream novelty markets is not something that a court can divine one year later without the assistance of fairly detailed data. We do not have the well-established products and inter-brand competition information that were determinative in the cases relied upon by the defendants. *See, e.g., H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 457 F.Supp. 75, 1978–1 Trade Cas. (CCH) ¶ 62,082 at 74,711 (S.D.N.Y.1978) (court took judicial notice that relevant product market could not be limited to the products of Eli Lilly & Co. because several other large pharmaceutical manufacturers clearly were in the same arena of competition); *Mogul, supra,* 391 F.Supp. at 1313 (court took judicial notice that relevant product market could not be limited to the Cadillac, since other luxury automobiles were clearly in the same market).

We conclude, therefore, that judicial notice cannot be taken at this time and that there remains a genuine issue of material fact as to the relevant product market. The existence of this issue leaves us no

---

**16.** Although the defendants argue for dismissal on the additional ground that no conspiracy to monopolize existed, just as they argued with respect to the section 1 claim, *supra* at 939–942, their argument is no more persuasive here than it was there.

**17.** Indeed, one of the defendants' exhibits, a 1982 article in Newsweek Magazine summarizing the astounding success of Chipwich, causes the Court to suspect that, if the relevant product market were defined as all chocolate-chip-cookie-ice-cream-sandwiches, then Martin *might* be able to prove Chipwich's dominance of the market.

choice but to deny the defendants' motions with respect to the section 2 claims.[18]

*D. Claim of Price Discrimination*

■ The core of Martin's claim of price discrimination in violation of section 2 of the Robinson-Patman Act, 15 U.S.C. § 13 (1976), is worded: "On information and belief, beginning in or about early December 1981, Chipwich, pursuant to the aforesaid exclusive sales agreement with [Premium], has sold [C-wiches] of like grade and quality to [Premium] at prices below those charged to Martin." Complaint ¶ 34. In response to these motions, however, the attorney for Martin, Mr. Steven Thal, has admitted in his affidavit that Martin knows of no facts supporting this claim.

> We made this allegation in the complaint on information and belief thinking at the time that Premium had become a strawman distributor to Pathmark and Shoprite in lieu of Martin and had been able to sell to these chains due to a price concession. We have no specific information at this time supporting our hypothesis.

Affidavit of Steven H. Thal ¶ 25, at 14 (filed August 11, 1982). Martin now asks that it be given an opportunity to discover a basis for its claim, while the defendants contend that the claim should simply be dismissed.

The Court finds itself in great sympathy with the defendants' position. In *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635 (9th Cir.1969), the court held that where no genuine issue of material fact is presented and the non-movant plaintiff "not only states that he has no knowledge of the facts alleged in his complaint, but asserts that he knows of no evidence supporting his allegations," summary judgment may properly be entered for the defendant. *Id.* at 643–44. We are faced with just such a situation in the instant case. All of the affidavits and exhibits confirm that Chipwich never sold

any C-wiches to Premium. The Robinson-Patman Act does not apply to transactions which are not sales, and it has been held not to apply to agency or consignment transactions. *See, e.g., National Auto Brokers Corp. v. General Motors Corp.,* 376 F.Supp. 620, 626 (S.D.N.Y.1974), *aff'd,* 572 F.2d 953 (2d Cir.1978), *cert. denied,* 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979). Martin's concession merely confirms the lack of evidence tending to establish a purchaser-seller relationship between Premium and Chipwich. In the absence of such a relationship, Martin's claim of price discrimination must fail.

Were this the only claim before the Court, we would undoubtedly grant summary judgment. However, in this case, in which the other antitrust claims are to go forward and the discovery required to develop them is virtually the same as that which would be required to develop the price discrimination claim, granting summary judgment at this point would serve no purpose. Such a disposition would save the defendants no costs in time, effort, or money and would deprive the plaintiff of whatever opportunity it may otherwise have to build a foundation under the claim, which has at least been adequately pled. Since the facts are exclusively in the possession of the moving party and discovery has barely begun, it appears desirable for the Court to exercise its discretion and deny the motion with leave to renew when discovery is complete. *See, e.g., Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); 10 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2728, at 557 & n. 56 (1973 and Supp.1982). The plaintiff's offer to voluntarily withdraw the claim if it fails to discover evidence of a purchaser-seller relationship has already been established on the record and reduces even further any risk of unfairness to the defendants.

---

18. This denial is in no way intended to discourage either party from later submitting the full information that would be necessary for the Court to take judicial notice of the relevant product market. Clearly, it is to the advantage of the parties and the Court, to have this issue determined as early in the litigation as possible.

Accordingly, the defendants' motions with respect to the price discrimination claim is denied.

## E. Claim of Tortious Interference with Contractual Relations

■ The defendants move to dismiss this claim for failure to state a cause of action.[19] The elements of tortious interference with contractual relations are fourfold, namely: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of a breach of the contract by the third party; and (4) damages caused by the breach. *Optivision, Inc. v. Syracuse Shopping Center Assocs.*, 472 F.Supp. 665, 684 (N.D.N.Y.1979); *Diehl & Sons, Inc. v. International Harvester Co.*, 445 F.Supp. 282, 291 (E.D.N.Y.1978). The defendants contend that Martin's claim fails to allege the most critical element: the existence of a contract between Martin and either supermarket.

■ A review of the complaint reveals that the defendants are correct. After alleging that it began making sales to Pathmark and Shoprite, Martin merely alleges that the defendants "penetrated" Martin's accounts with those two chains by making direct sales to them and undertook such conduct "tortiously, intentionally and with malice in order to deprive Martin of its contractual relations with its customers, its goodwill and its efforts in promoting [C-wiches]." Complaint ¶¶ 64 & 65.

Such a conclusory allegation as that quoted above fails to identify the elements of the tort and denies the defendants an opportunity to respond. The complaint does not refer the defendants to a valid, existing contract between Martin and its customers, or to any terms of such a contract.[20] That failure by itself warrants the dismissal of the claim. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 837–38 (2d Cir.1980); *Pinnacle Books, Inc. v. Harlequin Enterprises Ltd.*, 519 F.Supp. 118, 121 (S.D.N.Y.1981); *Robbins v. Ogden Corp.*, 490 F.Supp. 801, 810 (S.D.N.Y.1980).

The Court, therefore, grants the defendants' motions to dismiss the claim of tortious interference with Martin's contractual relations.[21]

## F. Claim of Tortious Interference with Economic Advantage

■ This type of tort has been variously referred to as interference with either economic advantage, prospective advantage, business relations, or pre-contractual relations. Whatever the most apt rubric may be, the elements of the tort are the same, namely: the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are "dishonest, unfair or in any other way improper." *Robbins, supra*, 490 F.2d at 811; *see also Noah v. L. Daitch & Co., Inc.*, 22 Misc.2d 649, 192 N.Y.S.2d 380, 386 (Sup.Ct.1959). In this case, the defendants contend that Martin has presented neither aspect of the second element of the tort—neither a solely malicious motive nor any improper means on the part of the defendants.

■ The Court, however, cannot agree with the defendants, at least not to the extent that it finds that Martin has adequately pled and raised a question of fact concerning improper means of interference

**19.** With respect to this claim only, the Court has considered only the pleadings and applies the standard of review appropriate for a motion to dismiss, pursuant to Fed.R.Civ.P. 12.

**20.** We must assume that any such third-party contract that may exist lies solely within the knowledge and possession of Martin, particularly since it has also failed to allege the second element of this tort, i.e., the defendants' knowledge of the contract. Thus, the Court finds it

inexplicable that the existence and terms of the contract are not pled.

**21.** To the extent that the plaintiff may have intended the Court to consider the vague allegations in this claim to mean a tortious interference with Martin's precontractual relations, rather than with existing contracts, we do so in our discussion of the claim of tortious interference with Martin's economic advantage, which follows.

by the defendants.[22] It is beyond dispute that a conspiracy to unreasonably restrain trade or to monopolize trade would constitute improper means. Thus, if Martin is able to prove the antitrust violations discussed earlier, it will also be able to prove improper means.

Martin has also adequately pled the first element of the tort—the defendants' alleged interference with the economic advantage or business relations that Martin was developing with Pathmark and Shoprite. Although it would appear that the defendants knew of these relations, for the defendants first asked Martin to approach the chains and shortly thereafter began taking large orders from Martin, Chipwich and Premium deny there were any business relations with which the defendants could have interfered. Thus, a second material fact is at issue here.

Consequently, the defendants' motions with respect to the claim of tortious interference with business relations must be denied.

## III. CONCLUSION

For the reasons outlined above, the defendants' motions with respect to all claims, except that of tortious interference with contractual relations, are denied. The claim that is excepted from the denial is hereby dismissed with leave to amend. The denial of summary judgment with respect to the other seven claims is made without prejudice to the rights of the defendants to renew their motions once additional discovery has been completed.

SO ORDERED.

---

**22.** The Court does agree, though, that Martin may not rely upon the solely malicious motive alternative, for the plaintiff has claimed that the defendants were also motivated by their own economic self-interest, Complaint ¶¶ 27 & 70.