**INTALITE INTERNATIONAL, N.V., Plaintiff,**

v.

**NEO RAY LIGHTING SYSTEMS, INC., Neo Ray Products, Inc., Zylo Louver Corporation, and Leon Conn, Defendants.**

**No. 82 Civ. 3789 (PNL).**

United States District Court, S.D. New York.

Aug. 6, 1987.

Solin & Breindel, P.C., New York City (Howard Breindel, Robert Aronson, of counsel), for plaintiff.

Michael H. Singer, P.C., and Bertram Zweibon, New York City (Michael H. Singer, Bertram Zweibon, of counsel), for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## OPINION AND ORDER

LEVAL, District Judge.

This is an action for breach of contract. The complaint also alleges infringement of patent. The parties stipulated to a nonjury trial by submission of the contract issues.

The events in controversy began in early 1975. Plaintiff and defendant both were involved in the manufacturing, sale or licensing of metal ceiling systems. Plaintiff, which was one of a family of companies established and operating in different countries, held a Canadian patent (and had applied for a U.S. patent) covering a "light transmitting false ceiling" giving the appearance of an egg-crate cellular grid "made up of louvers and supporting runners, the latter being ... suspended from a normal ceiling ... [and t]he louvers hav[ing] extensions at opposite edges for engagement with and support by the adjacent runners." U.S. Patent No. 4,034,534; Pltf Exh. 38. Plaintiff referred to this product under the trade name Magnagrid. Plaintiff's President and principal, Gerald Morris, looking through a catalogue of defendant Neo Ray's ceilings saw an item under the trade name Bold Cel which he believed infringed plaintiff's patent for Magnagrid. He called Neo Ray's President Leon Conn and said so. By letter of April 24, 1975, Morris claimed infringement and demanded that Conn withdraw the catalogue that contained the listing of Bold Cel. (Exh. 13.) Defendant's Bold Cel and plaintiff's Magnagrid were very similar in appearance, but with an important difference in technology. Bold Cel required factory assemblage of three-dimensional egg-crate modules and, consequently, shipping in bulky packages. Plaintiff's Magnagrid was designed to permit the crosswise louvers to be snapped onto the runners upon installation, which simplified the manufacturing and shipping processes.

Conn inquired as to the availability of a license for Magnagrid. Intalite, however, had contracted for an exclusive U.S. license for Magnagrid in favor of a third company named Butterfly, whose principal was Arthur Segil. Morris, Conn and Segil then began a round of negotiations seeking a set of understandings as to licenses, royalty payments and agreements-not-to-compete. After several weeks of negotiation, understandings were reached. Intalite and Neo Ray entered into a written contract dated July 29, 1975, which is the subject of this lawsuit.

The agreement is somewhat sketchy. It is here quoted in substantial part (with particularly significant passages underlined):

THIS AGREEMENT is made ... this 29th day of July, 1975, by and between INTALITE INTERNATIONAL N.V., an Antillian Corporation, ... INTEGRATED LIGHTING CANADA LIMITED, a Canadian Corporation ..., both companies hereinafter referred to collectively as "INTALITE" and NEO RAY LIGHTING SYSTEMS INC. [and others] ..., hereinafter collectively referred to as "NEO–RAY".

*WHEREAS, Intalite has developed ... a product known as "Magnagrid"* in various countries and markets this product in the United States under the name of "Butterfly 514" and has applied for a patent in the United States ... and

*WHEREAS, Neo-Ray is desirous of manufacturing and marketing a product known as "Bold Cel" which incorporates some of the features of Magnagrid,*

NOW, THEREFORE, it is agreed as follows:

BOLD CEL LICENSE *Intalite hereby grants to Neo-Ray a license to manufacture the product Bold Cel, which license shall be limited to the United States.... This license is limited to the exact dimension as set forth on page 13 of the Neo-Ray brochure identified as A1103, A1113 and A1123,....*

Neo-Ray specifically warrants and represents that it will not directly or indirectly manufacture and/or market and sell products similar to Bold Cel in larger cube size dimensions and products substantially similar to the Magnagrid or Butterfly 514....

*ROYALTIES—Neo-Ray hereby agrees to pay to Intalite a royalty on all sales of Bold Cel as follows: seven cents (7c) per square foot of Bold Cel ... sold....*

*PAYMENTS AND RECORDS—*Neo-Ray will cause to be kept true accounts ... and shall ... provide a statement in writing ... giving full particulars of the products manufactured and/or sold ... accompanied by a remittance....

Intalite shall be entitled to inspect certain records of Neo-Ray....

\* \* \* \* \* \*

PATENTS & PATENT APPLICATIONS—*The Magnagrid patent applied for by Intalite may not be issued in the United Stated[sic]. The non-issuance of this patent shall not affect this agreement....*

\* \* \* \* \* \*

*Neo-Ray hereby gives Intalite the royalty free right to use of any of the features of the patent owned by them known as Zingone 3.050.162....*

WARRANTIES BY INTALITE—*Intalite hereby agrees that it will not manufacture and/or market, or license* any other party to manufacture or market *the product Bold Cel* (hereinbefore described) *in the United States....* Intalite agrees that should it terminate its agreement with Butterfly Corp. for the U.S. distribution of Magnagrid (sold in the U.S. under the name "Butterfly 514"), then Intalite shall give Neo-Ray the right of first refusal before giving any other party the rights to market and sell Magnagrid in the U.S. ...

\* \* \* \* \* \*

For five years thereafter, events proceeded without dispute. Each year in May, Neo Ray sent Intalite a check for royalty payments due under the contract from the previous year's operations.

In 1981, however, disputes developed: Morris advised Conn that Neo Ray's listing in its new catalogue of Bold Cel in larger sizes than the agreement permits was a breach of the agreement. Conn saw a Dun & Bradstreet report indicating that Butterfly had merged with a company called Inta Lite Louvers & Ceilings, Inc. Conn testified that when he learned of Butterfly's merger with an Intalite company, he believed that by making this merger without offering him the exclusive U.S. Magnagrid license, Intalite had breached its commitment to offer Neo Ray the U.S. distribution of Magnagrid. Neo Ray stopped sending royalty checks to Intalite. Intalite protested. Intalite demanded access to Neo Ray's books and an accounting. Neo Ray refused. This lawsuit followed.

------------------------

The first question in dispute is whether Intalite breached the contract thereby excusing Neo Ray from further performance. Neo Ray claims that the merger of Butterfly with an Intalite company effectively terminated Butterfly's exclusive U.S. license for Magnagrid. It contends that upon that termination Intalite was required by the agreement (see "Warranties by Intalite") to offer Neo Ray the exclusive U.S. license for Magnagrid. Neo Ray contends that the failure to offer it the Magnagrid exclusive was a breach of the agreement.

The principal problem in Neo Ray's argument is that there is practically no evidence as to what happened. Conn claimed in his testimony that he had a series of telephone

conversations with Morris in 1982, in which Morris had told him Butterfly had defaulted, Conn had demanded the license, Morris had refused and Morris had finally told him of Intalite's absorption of Butterfly. Conn testified that he had protested to Morris that this breached the contract and justified Neo Ray's refusal to pay further royalties.

Conn's version of the conversations between the two is undercut by correspondence from Morris to Conn in the same period demanding the overdue royalty payment and exhibiting no awareness of Conn's contention that Intalite had breached. On May 13, 1981 Morris wrote to Conn charging that Neo Ray's publication in its new catalogue of Bold Cel in sizes larger than those permitted by the license breached the agreement. (Exh. 32.) There is no written answer by Neo Ray. On February 23, 1982, Morris wrote demanding the nine-month overdue royalty payment and repeating his contention that Neo Ray had breached its agreement by offering Bold Cel in larger sizes than permitted under the license. (Exh. 33.) Although Conn claims he answered this letter by a telephone conversation in which he charged Intalite with breach, Morris wrote again on April 1, 1982 saying "I regret that you have not replied to my letter of February 23, 1982 in which I requested that you bring your royalty payments ... current...." (Exh. 34.)

■ If in 1982 Conn claimed that Morris had orally admitted a breach by Intalite which justified Neo Ray's cessation to pay royalties, it is at least surprising that Conn would have neither written to Morris on the subject nor even made a written memorandum of the inculpatory conversation. The only further proof on which Neo Ray relies is the inconclusive hearsay Dunn & Bradstreet report of a merger between Butterfly and Intalite Louvers & Ceilings Inc. (Exhs. 24 and 25) and Morris' testimony naming Arthur Segil as one of Intalite's employees. (Morris Dep., pp. 23, 118.) Whether Butterfly was in fact absorbed by

plaintiff and, if so, whether such action breached Neo Ray's right of first refusal is left quite unexposed by the evidence. I conclude that Neo Ray has failed to prove its contention that Intalite breached its contractual obligation to offer Neo Ray a first refusal of an exclusive license for Magnagrid.[1]

The second issue in dispute is the scope of the license and the royalty obligation. Neo Ray contends it had no obligations under the license agreement except to the extent it utilized the Magnagrid technology covered by Intalite's patent application. It contends it never used the Magnagrid technology in its Bold Cel ceilings and therefore owed no royalties. Although the license agreement states that Neo Ray will pay "a royalty on all sales of Bold Cel," Neo Ray contends that in the context of the agreement, these references to Bold Cel meant Bold Cel utilizing Magnagrid technology. Neo Ray contends that this reading is supported by an introductory WHEREAS clause of the agreement which states "WHEREAS, Neo-Ray is desirous of manufacturing and marketing a product known as 'Bold Cel' which incorporates some of the features of Magnagrid...." This clause, it argues, suggests that the license it obtained and paid for was to incorporate Magnagrid features into its Bold Cel product.

Neo Ray also contends that it would make no sense for it to have agreed to limitations (of size) and payment of royalties on its own product. It asserts it had completed at least two installations of Bold Cel before this agreement and had no reason to take on limitations and burdens as to its marketing of Bold Cel, unless it adopted Intalite's proprietary features of Magnagrid.

■ Neo Ray's contentions, however, are disproved by the express words of the contract, by the conduct of the parties and by the testimony of Leon Conn, Neo Ray's own chief executive.

---

1. I note that Neo Ray's questions on Morris' deposition as to a merger were not answered on instructions from Intalite's counsel. Defendant never sought an order compelling this discovery. In the end, it failed to offer sufficient proof to support its contention.

The contract, on its face, clearly states that the license, the size limitations and the royalty obligation pertain to all Neo Ray's sales of Bold Cel without limitation. It recites, for example,

> ... Intalite hereby grants to Neo-Ray a license to manufacture the product Bold Cel, ... [limited to specified sizes.]

> Neo-Ray specifically warrants and represents that it will not directly or indirectly manufacture and/or market and sell products similar to Bold Cel in larger cube size dimensions....

> ... Neo-Ray hereby agrees to pay to Intalite a royalty on all sales of Bold Cel....

In contrast to these broad references to Bold Cel, the contract elsewhere uses narrower terms providing that

> ... Neo-Ray hereby gives Intalite the royalty free right to use of any of the features of the patent owned by them known as Zingone 3.050.162....

The difference in formulation further undercuts Neo Ray's contention as to the intended meaning of the Bold Cel license.

Nor does the WHEREAS clause cited above support Neo Ray's reading. That clause makes at least as much sense if read as Neo Ray's acknowledgement that Bold Cel "incorporates some of the features of Magnagrid," thus justifying its acceptance of a license and undertaking to pay royalties on all Bold Cel sales.

The agreement further recites that its terms shall not be affected even if the Magnagrid patent is not issued to Intalite in the U.S. This clause tends to confirm that the payment is being made in exchange for something other than a licensing of Intalite's patent claims.

Nor does the logical context of the agreement support Neo Ray's argument that it had no motive to pay a royalty on what it already owned. For, in addition to the Bold Cel license, the agreement conferred other valuable rights on Neo Ray. Most important was Intalite's agreement not to compete with Neo Ray's Bold Cel in the United States. This gave Neo Ray freedom from competition in its sales of Bold Cel and provided substantial justification

for Neo Ray's agreement to pay a small royalty on all its sales of Bold Cel. Second, Intalite gave Neo Ray a right of first refusal for the U.S. distribution of Magnagrid in the event it should terminate its agreement with Butterfly. Conn testified he considered this a valuable right acquired under the contract. Third, by agreeing to the contract, Neo Ray avoided the lawsuit Morris had threatened to bring at the start of the negotiations when he warned Conn of his contention that Bold Cel infringed the Magnagrid patent and demanded withdrawal of Neo Ray's catalogue. Finally, the contract included the right to use Magnagrid's highly economical features in Neo Ray's production of Bold Cel. As Leon Conn's testimony confirmed (see below), these were ample reasons for Neo Ray to pay Intalite a royalty on all its sales of Bold Cel, regardless whether employing the Magnagrid on-site-assembly technology.

Neo Ray's contentions as to the meaning of the agreement are also substantially undercut by its own conduct. Although it contends it never utilized the Magnagrid technology in its sales of Bold Cel (because it found the necessary retooling too expensive), it nonetheless paid royalties to Intalite on all its sales of Bold Cel for a period of five years. Neo Ray would not likely have made such payments if it had not believed this was called for by the contract. And when Neo Ray stopped making payments in the sixth year, according to the testimony of its chief executive this was not because the contract contained no such obligation, but rather because Conn believed that Intalite had breached its obligations. (Conn Dep., pp. 98–99.)

Finally, Neo Ray's contentions are directly contradicted by the testimony of its own president. When asked at his deposition whether it was his understanding that Neo Ray was obliged to pay a royalty only if it used the Magnagrid technology, Leon Conn answered "No.... It was understood that I would pay the royalty [on Bold Cel] regardless of whether I used the [Magnagrid] features or not. I had the right to use them but it was not required of me to use

them in order to pay the royalty." (Conn Dep., pp. 122–23.) He went on to explain that this was because under the agreement, he received three valuable rights in addition to the Magnagrid license. (Conn Dep., p. 123.) He specified that the agreement gave him Intalite's covenant not to compete in the U.S. in Neo Ray's three sizes; Intalite's promise of a first refusal for the U.S. distribution of Magnagrid in the event Butterfly's license were terminated, and finally, the amicable resolution of Intalite's threatened lawsuit claiming that Bold Cel infringed Intalite's Magnagrid patent rights. (Conn Dep., pp. 96–97, 123.) Conn clearly testified that in exchange for these benefits, he had agreed to pay the royalty on all his Bold Cel sales, regardless whether he employed Magnagrid's technology.

Conn's testimony is, of course, contradicted by his affidavit, no doubt drafted under the careful supervision of Neo Ray's attorney. Oral testimony is not necessarily more reliable than an affidavit.[2] There is no doubt that a witness can become confused upon examination and can testify mistakenly. At times, therefore, notwithstanding the greater opportunity for fabrication, the affidavit, prepared in a more careful and studied fashion, can be more reliable than spontaneous testimony.[3] In this instance, however, it is the testimony rather than the affidavit that suggests reliability. In this testimony, Conn exhibits a clear understanding of the overall terms of the agreement. His explanation makes perfect sense. His explanation is consistent with his conduct in paying the royalty for five years notwithstanding that he never used the Magnagrid technology. It is consistent also with his other testimony that his ultimate refusal to pay depended on his belief that Intalite had breached its obligations. In accordance with Conn's testimony, I find it was the intent of the contracting parties that Neo Ray would pay a royalty on all sales of Bold Cel, regardless whether it used the snap-lock features of Magnagrid.

I find that Neo Ray has breached its obligations under the agreement by (1) its failure to pay royalties on its sales of Bold Cel, (2) its offer of Bold Cel in "larger cube size dimensions" than permitted by the agreement, and (3) its failure to disclose its records to Intalite.

A partial judgment may be submitted embodying the terms of this order and requiring Neo Ray to furnish an accounting. Discovery shall be conducted on dam-

---

2. Morris, in his deposition, may also have made an admission damaging to his company's contention. He gave the following answers:

Q: Is Magnagrid sold under any trade name other than [Magnagrid and Butterfly]?

\* \* \* \* \* \*

A: Well, Neo Ray sells it under the name of Bold Cel.

Q: Can you tell me an installation by Neo Ray that utilized the Magnagrid?

A: I am not aware of them by name, but for years under our agreement Neo Ray acknowledged sales of these production [sic] and paid royalties on it.

(Morris Dep., p. 45.)

If Morris believed that Neo Ray's payment of royalties constituted its acknowledgement that it had used Magnagrid, that must mean Morris believed the royalty was not payable unless Neo Ray employed Magnagrid technology in its sales of Bold Cel. The value of the inference is inconclusive, however, because of uncertainty as to what Morris considered to be encompassed by the Magnagrid technology. If, as he argued in his April 24, 1975 letter to Conn (Exh. 13), he believed that any sale of Bold Cel would infringe Magnagrid, regardless whether it utilized the on-site-snap-on feature, then this testimony is completely consistent with plaintiff's contention that Neo Ray needed a license to sell Bold Cel. At worst, this testimony is too inconclusive to rebut the multifaceted support in the evidence for plaintiff's contentions as to the meaning of the contract.

3. *Cf. Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir.) (disregarding factual claims made in opposition to summary judgment motion which contradicted earlier affidavits, deposition testimony, and interrogatory responses), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982); *Schwimmer v. Sony Corp.*, 637 F.2d 41, 45 (2d Cir.1980) (court may conclude that affidavit conflicting with earlier deposition testimony raises no genuine issue of fact); *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 577–78 (2d Cir.1969) (same; " 'The deposition of a witness will usually be more reliable than his affidavit since the deponent was ... at least available *to* opposing counsel for cross-examination. Nevertheless, ... the court may not exclude the [conflicting] affidavit from consideration....' " (*quoting* 6 Moore, *Federal Practice* ¶ 56.22[1] at 2814 (2d ed. 1965)).

ages for a ninety-day period. A conference is scheduled between the court and counsel for November 13, 1987 at 2:30 o'clock.

SO ORDERED.